[No. S004609, Crim. No. 23593. Mar. 25, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD JAY BEARDSLEE, Defendant and Appellant.

72

**COUNSEL**

Richard L. Phillips, under appointment by the Supreme Court, and Thomas Lundy for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias, Morris Beatus and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARABIAN, J.**—Defendant Donald Jay Beardslee was charged under the 1978 death penalty law with the first degree murders of Paula (Patty) Geddling and Stacy Benjamin under two special circumstances. A jury

found defendant guilty of committing both murders with premeditation and deliberation (Pen. Code, §§ 187, 189; all section references are to that code unless otherwise indicated) and further determined that each murder was committed under two special circumstances: concurrent conviction of multiple murders (§ 190.2, subd. (a)(3)) and intentional killing for the purpose of preventing the victim from testifying as a witness to a separate crime (§ 190.2, subd. (a)(10)). Defendant also was found to have personally used a firearm in the murder of Patty Geddling (§§ 1203.06, subd. (a)(1), 12022.5) and a knife in the murder of Stacy Benjamin (§ 12022, subd. (b)).

A penalty trial was then held before a different jury, which determined that defendant should suffer the death penalty for the murder of Patty Geddling and life imprisonment without possibility of parole for the murder of Stacy Benjamin. (See §§ 190.3, 190.4, subd. (a).) The trial court denied defendant's motions to strike the special circumstances and to modify the penalty, and entered a judgment of death. (§ 190.4, subd. (e).) Defendant's appeal is automatic. (§ 1239, subd. (b).)

We conclude that one of the multiple-murder and both witness-killing special circumstances must be set aside, and that the judgment otherwise be affirmed.

### GUILT PHASE EVIDENCE

Patty Geddling, age 23, and Stacy Benjamin, age 19, were murdered at separate locations on April 25, 1981. At the time of their deaths, they were living together as close friends. Stacy sold drugs and had a reputation for "ripping people off." Patty on occasion also sold drugs.

Defendant, age 37, was then living in his studio apartment in Redwood City with Ricki Soria, whom he had met two months earlier while she was hitchhiking. Defendant wanted to help Soria stop using drugs and to separate her from Ed Geddling (Patty's estranged husband) and Frank Rutherford, who were drug dealers. Rutherford had a reputation for carrying guns and collecting drug debts, and had bragged that he would never go to jail because he or his brothers would take care of any witnesses. He was prosecuted separately for the present killings, and defendant's transcribed testimony at Rutherford's preliminary hearing comprised a principal part of the prosecution's guilt phase evidence against defendant.

On April 23, Soria told defendant that Stacy had cheated William Forrester in a drug deal. The next afternoon, defendant agreed with Soria and Rutherford to help Forrester get back at Stacy and Patty that evening in defendant's apartment. Forrester came to the apartment, and defendant

picked up Rutherford, who had a shotgun. The four discussed plans for trapping the victims. Rutherford cut a wire and twisted the ends around shotgun shells. At defendant's request, Soria went out and bought tape for gagging the victims. It was agreed that when the victims arrived, Soria would sit on the sofa, defendant would open the door, and Rutherford and Forrester would hide. Defendant testified he expected Rutherford and Forrester to "rough [the victims] up a little bit," tie and gag them, take their money and drugs, and leave.

The victims arrived around 6:30 p.m. As defendant opened the door and they approached Soria, defendant heard the shotgun fire. He then saw that Rutherford was holding the gun and that Patty was wounded in the left shoulder. Defendant took her into the bathroom and tried to stop her bleeding. Both victims' hands and feet were tied. Rutherford told Patty they would take her to the hospital, and repeated this statement in Stacy's presence while winking at defendant. Between 9 and 10 p.m., defendant and Forrester left and brought back Rutherford's car.

After a discussion with Rutherford about taking the victims somewhere in their own van, defendant believed the victims would be killed. But when Rutherford handed him some shotgun shells, defendant said, "I'm not going to do this." Forrester said, "Well, I guess I'm going to do it." Patty was loaded into the victims' van, which was driven away by Forrester with defendant as a passenger. Soria followed in defendant's car. Rutherford stayed behind with Stacy.

Forrester drove south on Highway 1 and onto Bean Hollow Road, where they stopped. Patty got out of the van and began pleading for her life. Defendant loaded the gun for Forrester, who shot Patty twice. Defendant reloaded and also fired at her twice.

Leaving Patty's dead body in a ditch beside the road, they departed, Soria and Forrester in the van and defendant in his own car. When the van ran out of gas, the three wiped off their fingerprints and abandoned it. Defendant and Soria then dropped off Forrester and returned to defendant's apartment. While there, they received a telephone call from Rutherford, asking them to join him at the nearby apartment of his girlfriend, Dixie Davis. Arriving at Davis's apartment between 3 and 3:30 a.m., they found Stacy watching television. Out of Stacy's hearing, defendant told Rutherford that Forrester had "chickened out" and defendant had to finish the job. Rutherford said defendant should have killed Forrester; defendant replied that Soria had refused to give him more shells for that purpose. Then, in Stacy's presence, defendant and Rutherford had a conversation implying that Patty was in the hospital.

About 5 a.m., defendant, Rutherford, Soria, and Stacy left in defendant's car. They stopped at a service station where Stacy collected money she was owed for drugs, stopped in Pacifica where Soria obtained cocaine, and made two more stops to consume the cocaine before crossing the Golden Gate Bridge. They stopped to see Rutherford's brother in Sebastopol, where defendant heard Rutherford obtain advice from the brother on where to "drop off" Stacy. Defendant understood this to refer to killing Stacy and leaving her body somewhere.

They headed north on Highway 101 and turned onto a winding side road. Defendant was driving. Rutherford told Stacy they were going to Lakeport to obtain drugs. They stopped at a turnout. Stacy was upset, but Rutherford coaxed her out of the car, and all four walked up the hill. Soria and Rutherford went back to the car, and Stacy asked if defendant was supposed to strangle her then. He said, "No." When Soria returned with Rutherford, she told defendant in a low voice that Rutherford had "fixed up" the wire. Defendant and Soria walked further, where they could not see Rutherford and Stacy. Defendant heard some commotion, however, and Soria urged him to go help Rutherford.

Defendant found Rutherford sitting on Stacy, strangling her with his left hand. A broken wire lay under her neck. Rutherford called Stacy a "die hard bitch." Defendant saw Stacy give him a pleading look, and he punched her in the left temple, attempting unsuccessfully to knock her out. Defendant then held one end of a wire wrapped around Stacy's throat while Rutherford pulled on the other end. Rutherford took both ends of the wire, pulled it tight, and twisted it. The two men dragged Stacy to a more secluded area. Defendant asked for Rutherford's knife and used it to slit Stacy's throat twice. After she was dead, defendant, at Rutherford's suggestion, pulled down her pants to make it appear that she had been assaulted sexually. Late that afternoon, Rutherford, Soria, and defendant returned to the Davis apartment.

Early that morning, Patty's body was found by joggers. A shoe repair claim ticket, recovered from her clothing, bore defendant's telephone number. Accordingly, Detective Sergeant Robert Morse of the San Mateo County Sheriff's Office called on defendant, who agreed to come to the sheriff's office to give a statement. Morse began the interview by talking about the difference between a witness and a suspect, and then asked defendant if he were involved in the case. Defendant replied: "Well, Frank [Rutherford] shot her but I guess I'm involved because I shot her in the head twice myself. I was afraid." Defendant was advised of his *Miranda* rights and gave a detailed, taped statement about both killings. From defendant's directions, officers found Stacy's body near the Hopland Grade Road in

Lake County, as well as numerous items of physical evidence at scattered locations in San Mateo County. A transcription of defendant's statement, as well as the tape itself, became a prosecution exhibit at the trial.

Defendant testified in his own behalf. His trial testimony, his prior testimony at the Rutherford preliminary hearing, and his taped statement were essentially consistent, except for differences in his versions of the fatal blows.

At trial and in prior testimony at the preliminary hearing, defendant said that after Forrester fired twice at Patty, defendant felt her pulse and decided she was dead. Nonetheless, he retrieved the gun from Forrester and fired twice in the direction of her head but did not think he hit her. He did this out of fear that Rutherford would have him killed if he were only a witness and not a participant in Patty's death. In his taped statement, however, defendant said he thought Patty was still alive after the shots by Forrester, and shot directly at her to keep her from suffering.

The condition of Patty's remains seemed more consistent with the taped statement. When her body was found, about one-third of her head was missing. According to the doctor who performed an autopsy, there were multiple shotgun wounds. One, in her left shoulder, preceded the others by several hours. A wound in her chest and another in her back, which occurred about the same time, would not have been immediately fatal; she could have survived for several minutes. The head wound, however, was inflicted by a shot or shots fired at extremely close range and caused instant death.

Similarly, defendant testified at trial and at the preliminary hearing that when he slit Stacy's throat, he concluded she was already dead because there was only one exhalation of breath, and the blood from her jugular vein dribbled out rather than spurting. He conceded he had helped Rutherford pull the wire around her throat, but he considered himself only a "minor" participant in her death. In his taped statement, however, he said that when he asked Rutherford for the knife, Stacy was still alive and trying to gasp, and that when he slit her throat he was trying to "make it quick."

The pathologist who examined Stacy's body testified that the knife wound cut her left jugular vein and exposed her air passage but did not cut the carotid artery. From the presence of blood in her lungs, he concluded that she must have been still alive when her throat was cut. He said the blood loss was relatively slow, "not the kind of blood loss you get from an artery."

Defendant testified as follows: He agreed at the outset to help Rutherford because he did not want to stand up to him. He felt shaky about Rutherford's bringing the shotgun to his apartment, but thought it would only be used as a scare tactic. He suggested Soria procure the tape for gagging the victims because he wanted to minimize any noise emanating from the apartment. But later in the evening, after Rutherford had used the shotgun on Patty, defendant became involved in the plans to dispose of the women out of fear for his life. He participated in both killings because he was afraid that Rutherford would have him killed if he were only a witness rather than a participant.

## I. Requested Instruction on Honest Belief in Imminent Peril as Negating Malice

Defendant relied on the defense that he participated in the homicides because he feared that if he did not do so, Rutherford would kill him or have him killed. Section 26 lists among those not capable of committing crimes "[p]ersons (*unless the crime be punishable with death*) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26, subd. Six, italics added.) The jury was instructed that a person is not guilty of a crime if he acts under threats or menaces that cause him reasonably to fear that his life would be in immediate danger if he did not do the otherwise criminal act. (See CALJIC No. 4.40; all references to CALJIC are to the fourth edition 1979, unless otherwise indicated.) But in accordance with the statutory exception, the jury was also instructed that such threats are not a defense "[w]here a person commits first degree murder with a special circumstance." (See CALJIC No. 4.41.)

In addition to the foregoing instructions on threats as an *absolute* defense, the court gave two other instructions that broadly authorized the jury to consider the effect of threats on the mental states requisite to murder. One of these instructions authorized the jury to consider "evidence show[ing] the existence of threats, menaces or compulsion that played a part in inducing the unlawful killing of a human being . . . for such bearing as it may have on the question of whether the murder was of the first or second degree." The other instruction stated as follows: "If you find from the evidence that at the time the alleged crime was committed the defendant honestly held a belief that his own life was in danger, you must consider *what effect, if any, this belief had on* the defendant and *whether he formed any of the specific mental states that are essential elements of murder.* [¶] Thus if you find he had an honestly held belief that his life was in peril and as a result did not maturely and meaningfully premeditate, deliberate and

reflect on the gravity of his contemplated act or *form an intent to kill*, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree. [¶] *Also*, if you find the defendant did not form the *mental state constituting express malice*, you cannot find him guilty of either the first or second degree. [¶] In the event that you find the defendant is guilty of one or more murders in the first degree, you may still consider the operation of threats, menaces or compulsion, if any, with regard to your finding on the special circumstances." (Italics added.)

■ Notwithstanding these instructions, defendant claims the trial court erred in refusing his request for an instruction that threats causing him to believe honestly that "his own life was in imminent peril" would negate malice aforethought and reduce his crime to voluntary manslaughter. The court declined not only this request but also all other requests for instructions on manslaughter. Defendant now contends that the court's action deprived him of the defense that even if he intended to kill, his honest but unreasonable belief in the necessity of self-defense negated the element of malice. He relies on *People* v. *Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1], in which we held that "[a]n honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (Italics omitted.)

We need not decide what relevance, if any, *Flannel* has to this case, for any error in refusing to give the requested instruction was harmless. As noted, the court instructed the jury to consider what effect an honest belief that defendant's life was in danger may have had on the formation of any of the specific intent requirements for first degree murder and the special circumstance allegations. The instructions "did not entirely remove the question of the defendant's mental state from the jury's consideration" (*People* v. *Croy* (1985) 41 Cal.3d 1, 13 [221 Cal.Rptr. 592, 710 P.2d 392]), or the question of his honest belief that his life was in danger. So instructed, the jury rejected a second degree murder verdict in favor of first degree.

In *Croy*, the trial court instructed the jury that an aider and abettor must have *knowledge* of the perpetrator's unlawful purpose, but erroneously did not instruct that he must also share the guilty *intent* of the perpetrator. Although intent is different from knowledge, we held that it may be possible to find that the error "could not possibly have affected the verdict—i.e., that no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime. In those cases the judgment could be affirmed." (41 Cal.3d at p. 14.) This rationale applies

here. No reasonable trier of fact, having rejected a second degree murder verdict in favor of first degree after being instructed to consider any honest belief that defendant's life was in danger, would have returned a manslaughter verdict because of the same factor under the instructions the court did not give. Any error was thus harmless.

## II. EFFECT OF INSTRUCTIONS UPON DEFENSE OF HONEST BUT UNREASONABLE MISTAKE

Defendant contends that an erroneous jury instruction deprived him of the defense that he did not intend to kill the victims because he honestly but mistakenly believed they were dead when he inflicted the fatal blows. He concedes that the instruction authorized the defense if the honest mistake was found to be reasonable but complains that the instruction improperly deprived him of the defense if the mistake was found to be honest but unreasonable.

Defendant requested, and the court orally gave, the following jury instruction: "An act committed or an admission [*sic*: omission] made under an ignorance or mistake of fact which disproves any criminal intent is not a crime. Thus a person is not guilty of a crime if he commits an act or omits to act under an *honest or reasonable* belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful." (Italics added.) During jury deliberations, however, the jury requested and was given a written copy of the instructions in which the phrase "honest or reasonable," italicized in the foregoing quotation, appeared as "honest *and* reasonable" (italics added). Defendant now contends that the written form of the instruction, which conformed to CALJIC No. 4.35, erroneously precluded the jury from giving exculpatory effect to a mistake on his part that was honest even if not reasonable.

We need not decide what effect, if any, an honest but unreasonable belief that the victims were dead when defendant inflicted the fatal blows would have had upon his criminal liability for their deaths. Whatever the merits such a mistake-of-fact theory may have in the abstract, it has no application to this case. A court is required to instruct on a theory of the case only if it is supported by substantial evidence. (*People* v. *Flannel, supra,* 25 Cal.3d at pp. 684-685.) No such evidence exists even under defendant's version of the facts. Defendant played an active role both in the acts which actually killed the victims and in the acts which, under his theory, he *believed* killed them.

When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. (*People* v.

*Rivera* (1984) 157 Cal.App.3d 736, 743 [203 Cal.Rptr. 842].) Here, if the facts were as defendant supposedly perceived them, he still actively participated in both murders. Even if the jury had found that defendant thought Patty was already dead when he shot her, and that he thought Stacy was dead when he slit her throat, his participation in both crimes was not limited to the shooting or the throat slitting. With regard to Patty, defendant acknowledged that he was aware that she was going to be killed while they were still in his apartment. He drove with Forrester and Patty to a remote area. When Patty got out of the van and began pleading for her life, defendant loaded the gun for Forrester, who shot her twice. As to Stacy, before slitting her throat, defendant held one end of the wire around her throat while Rutherford pulled on the other end.

A belief, even if genuine, that different acts by defendant helped kill the victims than the acts that actually did so would not make defendant's actions lawful. Such a belief would not absolve defendant of the murders. The court was therefore under no duty to instruct on the defense. There was no error.

### III. INSTRUCTIONS ON PRINCIPALS, INCLUDING AIDERS AND ABETTORS

The jury was instructed that persons who are legally regarded as "principals in the crime . . . and equally guilty thereof, include [1] those who directly and actively commit the act constituting the crime or [2] those who with knowledge of the unlawful purpose of the person who directly and actively commits the crime intentionally aid and abet in its commission, or [3] those who, whether present or not at the commission of the crime, advise and encourage its commission." (See CALJIC No. 3.00.) Defendant contends that this instruction permitted the jury to return a verdict of first degree murder without finding that he acted with the requisite malice, premeditation, and deliberation.

■ Because the instruction was requested by defendant's trial counsel, as well as by the prosecution, the Attorney General contends that any claimed defects in it were waived. There appears no conceivable tactical purpose, however, for defense counsel's requesting an instruction that would erroneously lessen the prosecutorial burden of proving malice, premeditation, or deliberation. Claims of instructional error are reviewable when such error could only have resulted from counsel's neglect or mistake in requesting the instruction (§ 1259; *People* v. *Barraza* (1979) 23 Cal.3d 675, 683 [153 Cal.Rptr. 459, 591 P.2d 947]) even though defendant would be barred from challenging an instruction that his counsel requested for a deliberate tactical purpose (*People* v. *Avalos* (1984) 37 Cal.3d 216, 228-229

[207 Cal.Rptr. 549, 689 P.2d 121]). (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 353 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153]; cf. *People* v. *Marshall* (1990) 50 Cal.3d 907, 932 [269 Cal.Rptr. 269, 790 P.2d 676] [the requirement of a deliberate tactical choice is limited to situations in which the court is under an obligation to instruct sua sponte in a manner other than it did].) Accordingly, we examine defendant's present claim on its merits.

■ Defendant contends that under the instruction, if the jury determined that one or more persons other than himself, such as Rutherford, Forrester, or Soria, planned either of the killings, but that defendant was the one who inflicted the fatal wound, i.e., "directly and actively commit[ted] the act constituting the crime" (CALJIC No. 3.00), the jury could find defendant guilty of first degree murder whatever his mental state when he acted. Any such misleading effect of CALJIC No. 3.00 was precluded, however, by the instruction "not to single out any certain sentence or any individual point or instruction and ignore the others," but instead "to consider all the instructions as a whole and . . . to regard each in the light of all the others." (See CALJIC No. 1.01; *People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372].).

The jury was instructed that murder "perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." (See CALJIC No. 8.20.) Moreover, "[t]o constitute a deliberate and premeditated killing, the *slayer* must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." (*Ibid.*, italics added.) From these and other instructions, a reasonable juror would understand that one who becomes a principal to the crime of deliberate and premeditated first degree murder by "directly and actively commit[ting] the act constituting the crime" (CALJIC No. 3.00) must have *personally* premeditated and deliberated with malice aforethought. We need not consider a "tortuous analysis" of the instructions that no reasonable juror would undertake. (*People* v. *Warren* (1988) 45 Cal.3d 471, 488 [247 Cal.Rptr. 172, 754 P.2d 218].)

■ Defendant further claims prejudice from CALJIC No. 3.00's descriptions of two other kinds of principals—those "who, with knowledge of the unlawful purpose of the [active perpetrator] intentionally aid and abet" in the crime's commission, and those who "advise and encourage its commission." Those descriptions also, he contends, erroneously exposed him to conviction of first degree murder without a finding of premeditation and deliberation on his part.

Each of defendant's two convictions of first degree murder could have been based on either of two findings: that he was the actual perpetrator or that he was an aider and abettor. Defendant claimed that he did not actually kill either victim because Patty was already dead when he fired the shotgun at her, and Stacy was already dead when he slit her throat. The prosecutor vigorously disputed these claims, but argued that even if the jury were to accept them, it should nonetheless convict defendant of first degree murder as an aider and abettor. In accordance with this argument, the jury was given other instructions, in addition to CALJIC No. 3.00, on aiding and abetting.

Defendant contends that these aiding and abetting instructions, even in combination, were deficient in that they authorized his conviction of first degree murder without a finding by the jury that his acts of aiding and abetting were done with premeditation, deliberation, and express malice. No such finding was required.

■ In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we explained that "the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Id.* at p. 560.) We further explained in *People* v. *Croy,* *supra*, 41 Cal.3d 1, that the "aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury. (*People* v. *Beeman, supra*, 35 Cal.3d 547, 556.)" (*Id.* at p. 12, fn. 5.)

The jury was given the following instruction based on *People* v. *Yarber* (1979) 90 Cal.App.3d 895, 916 [153 Cal.Rptr. 875]: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he intentionally aids, promotes, encourages or instigates by act or advice the commission of such crime." In *Beeman, supra*, we criticized that instruction as "sufficiently ambiguous to conceivably permit conviction upon a finding of an intentional act which aids,

without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense." (35 Cal.3d at p. 561.) But any such ambiguity was rendered harmless as to defendant by the instructions underlying the verdicts of guilt of both murders with special circumstances. The jury was told: "If the defendant was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder in the first degree before you are permitted to find the alleged special circumstances of that first degree murder to be true as to the defendant." (See § 190.2, subd. (b).) The latter instruction apprised the jury that if defendant did not actually kill either victim, its verdict of guilt for the murder of that victim with special circumstances must be based on a conclusion that defendant intended to encourage or facilitate the actual killer's first degree murder of the victim. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 310-311 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Warren, supra*, 45 Cal.3d 471, 487-488.)

Defendant contends the instructions should have explicitly connected the mental state requisite to aiding and abetting with his defense that he participated in the killings out of fear for his life. Defendant did not request any such instruction but claims that the court should have instructed to that effect on its own motion. The instructions the court actually gave, however, fully covered any valid defense along these lines.

As stated earlier, the jury was told that if it should "find from the evidence that at the time the alleged crime was committed the defendant honestly held a belief that his own life was in danger," it should "consider what effect, if any, this belief had on the defendant and whether he formed any of the specific mental states that are essential elements of murder." The jury also was instructed that the specific intent with which an act is done may be proved by the surrounding circumstances, which must be not only consistent with the requisite specific intent but irreconcilable with any other rational conclusion. (See CALJIC No. 2.02.) The substance of that instruction was repeated with explicit reference to the mental state required for proof of a special circumstance. (See CALJIC No. 8.83.1.)

 "[I]n the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial." (*People* v. *Flannel, supra*, 25 Cal.3d 668, 681 [fn. omitted].) The instructions given the jury provided an ample basis for defendant to argue that his claimed fears for his life were inconsistent with an intent to encourage or facilitate either murder. None of the instructions

was inconsistent with that argument, and no additional instructions on the subject were required to be given sua sponte.

## IV. ABSENCE OF INSTRUCTION REQUIRING UNANIMOUS AGREEMENT ON FACTUAL BASIS FOR CONVICTION

■ Defendant contends the trial court should have instructed the jury on its own motion that there was evidence of more than one act on which a conviction of murdering Patty could be based, and that although defendant could be convicted of that murder by proof of any one or more of such acts, all jurors must agree that he committed the same act or acts. (See CALJIC No. 17.01.) (There is no such contention with respect to the murder of Stacy.)

The prosecutor argued that defendant should be convicted of the murder of Patty because he fired the fatal shot with intent to kill her, but that even if defendant was not the actual killer because she was already dead, or defendant's intent to kill was negated by a belief that she was already dead, defendant should be convicted of her murder as an aider and abettor. Defendant claims the jurors should have been told not to convict him of the murder unless they agreed unanimously either that he was the actual killer or that he was an aider and abettor.

■ A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses. (E.g., *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-283 [182 Cal.Rptr. 354, 643 P.2d 971] [multiple acts of bribery; single bribery charge]; *People* v. *Crawford* (1982) 131 Cal.App.3d 591 [182 Cal.Rptr. 536] [conviction of possession of firearm by ex-felon; four guns found separately in defendant's home]; *People* v. *Madden* (1981) 116 Cal.App.3d 212 [171 Cal.Rptr. 897] [conviction of forcible oral copulation; evidence of multiple acts].) A jury may convict a defendant of first degree murder, however, without making a unanimous choice of one or more of several theories proposed by the prosecution, e.g., that the murder was deliberate and premeditated or that it was committed in the course of a felony. "[I]t is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by the statute." (*People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956]; accord *People* v. *Guerra* (1985) 40 Cal.3d 377, 386 [220 Cal.Rptr. 374, 708 P.2d 1252].) Pursuant to the latter rule, it was held in *People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816-817 [221 Cal.Rptr. 275], that a conviction of second degree murder did not require unanimous agreement by the jurors on whether the accused was the actual perpetrator or was an aider and abettor.

██ Defendant urges us to reject the *Forbes* holding. He argues that the decision whether to convict a defendant as the actual perpetrator or as an aider and abettor is not just a selection of legal theories but is a determination of which acts were committed by the defendant. He relies on *People* v. *Dellinger* (1984) 163 Cal.App.3d 284, 300-302 [209 Cal.Rptr. 503], where a first degree murder conviction was reversed on the ground that the trial court should have instructed the jury on its own motion that a conviction required their unanimous agreement on whether the defendant killed the two-year-old victim by giving her cocaine or killed her by inflicting a fatal blow to her head.

The *Dellinger* holding does not apply here. ██ "A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People* v. *Gonzales* (1983) 141 Cal.App.3d 786, 791 [190 Cal.Rptr. 554]; accord *People* v. *Burns* (1987) 196 Cal.App.3d 1440, 1458 [242 Cal.Rptr. 573].) "[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case." (*People* v. *Crawford, supra*, 131 Cal.App.3d 591, 599; see *People* v. *Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423] [lead opn. of Kaufman, J.].)

██ Here, there was no prosecutorial contention that defendant committed multiple independent acts, any of which could have led to Patty's death. Instead, the two theories, that he was the actual perpetrator and that he was an aider and abettor, were based on a single course of conduct. It was undisputed that defendant allowed Patty to be lured to his apartment; helped take her to a deserted roadside with the understanding that she was to be killed; loaded the shotgun for Forrester, who shot her twice; and then shot her himself. Defendant claimed he was not the actual perpetrator because either (1) Patty was in fact killed by Forrester before defendant shot her, or (2) defendant believed she had been killed by Forrester and therefore did not shoot her with intent to kill. But even if some jurors concluded that defendant was the actual perpetrator and others concluded he was only an aider and abettor, there is no possibility that they disagreed on the facts necessary to support the aiding and abetting theory. The jurors who concluded that defendant intentionally killed Patty with premeditation and deliberation necessarily would have believed that if he was not the actual killer, he intentionally encouraged and facilitated the actual killer's perpetration of first degree murder. Since the jury had to agree unanimously at least on the facts required for conviction as an aider and abettor, and for application of the special circumstance findings to a person who was not the

actual killer (§ 190.2, subd. (b)), no further unanimity was required, and the unanimity instruction was not necessary.

## V. INSTRUCTION ON RIGHT TO REJECT ENTIRE TESTIMONY OF WITNESS WHO IS WILLFULLY FALSE ON MATERIAL POINT

 At the request of both parties, the trial court gave the jury the following instruction, based on CALJIC No. 2.21: "A witness willfully false in a material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless from all the evidence you shall believe the probability of truth favors his testimony in other particulars. [¶] However, discrepancies in a witness's testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience and innocent misrecollection is not uncommon." The instruction has been approved by this court, as well as by intermediate appellate courts, as a correct statement of the law. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1023 [264 Cal.Rptr. 386, 782 P.2d 627], and cases cited therein.)

Because the instruction could be applied to the testimony of defendant, he contends it erroneously shifted the burden of proof by allowing the jury to reject his entire testimony unless they believed from all the evidence that his testimony was favored by "the probability of truth." He claims the instruction thereby increased his burden from that of raising a reasonable doubt of the sufficiency of the prosecution's evidence to one of affirmatively proving his defenses. He relies on dictum in *People* v. *Lescallett* (1981) 123 Cal.App.3d 487, 493 [176 Cal.Rptr. 687], that perhaps the instruction "should be avoided where, under the circumstances of the case, it might appear to be directed principally toward a defendant's exculpatory testimony."

Although the instruction does appear applicable principally to defendant's testimony, not all that testimony was exculpatory. Indeed, neither side urged the jury to reject the *whole* of his testimony, because most of it, together with his testimony in a prior proceeding and his statement to the police introduced by the prosecution, constituted the backbone of the case against him. The controversial parts of his testimony, as to which his credibility was put in question, pertained to his claims of being motivated by a fear of Rutherford and others, and his assertions of the belief that each victim was already dead when he fired the shotgun or used the knife.

Thus, while the jury may well have applied the first sentence of the instruction ("A witness false in a material part of his testimony is to be

distrusted in others") to defendant's testimony, it was highly unlikely to apply the second sentence by "reject[ing] the whole testimony of" defendant. Yet it is only the second sentence to which defendant now objects. Even if the jury were to use the second sentence's criterion for rejecting the whole of defendant's testimony as a basis for rejecting some *part* of the testimony, defendant would not have been prejudiced. The instruction at no point *requires* the jury to reject any testimony; it simply states circumstances under which it *may* do so. (*People* v. *Johnson* (1986) 190 Cal.App.3d 187, 194 [237 Cal.Rptr. 479].) The qualification attacked by defendant as shifting the burden of proof ("unless from all the evidence you shall believe the probability of truth favors his testimony in other particulars") is merely a statement of the obvious—that the jury should refrain from rejecting the whole of a witness's testimony if it believes that the probability of truth favors any part of it.

"Thus CALJIC No. 2.21 does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute." (*People* v. *Blassingill* (1988) 199 Cal.App.3d 1413, 1419 [245 Cal.Rptr. 599].) "The weaknesses in [the defendant's] testimony should not be ignored or given preferential treatment not granted to the testimony of any other witness. As it has been aptly noted in other contexts, a defendant who elects to testify in his own behalf is not entitled to a false aura of veracity. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1] (impeachment with prior conviction); *People* v. *Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317] (impeachment with evidence of prior assaults on decedent).)" (*People* v. *Goodwin* (1988) 202 Cal.App.3d 940, 945 [249 Cal.Rptr. 430].) There was no error in giving the instruction in accordance with the parties' requests.

## VI. SUFFICIENCY OF THE EVIDENCE OF THE KILLING-OF-WITNESS SPECIAL CIRCUMSTANCE

■ Defendant contends that the evidence is insufficient to support the witness-killing special-circumstance findings as to both murders. We agree. The witness-killing special circumstance applies to the intentional killing of a person who witnessed a crime committed prior to, and separate from, the killing for the purpose of preventing the victim from testifying about the crime witnessed. (§ 190.2, subd. (a)(10); *People* v. *Garrison* (1989) 47 Cal.3d 746, 792 [254 Cal.Rptr. 257, 765 P.2d 419].) The crime witnessed cannot be deemed " 'prior to, and separate from,' " the killing when both are part of " 'the same continuous criminal transaction.' " (*People* v. *Benson* (1990) 52 Cal.3d 754, 785 [276 Cal.Rptr. 827, 802 P.2d 330]; *People* v. *Silva* (1988) 45 Cal.3d 604, 631 [247 Cal.Rptr. 573, 754 P.2d 1070].)

In *Benson*, the defendant murdered a mother and then, more than a day later, two of her children. We held the murder of the mother and those of

the children were "integral parts of a single continuous criminal transaction against the entire family. Accordingly, the witness-killing special-circumstance findings are invalid." (52 Cal.3d at p. 785.) The same rule applies here. The murders of both Patty and Stacy were part of the same continuous criminal transaction against both victims. We thus set aside both witness-killing special circumstances. Because of this, we need not consider defendant's contention that the court erroneously instructed the jury on these special circumstances.

## VII. REFUSAL TO GRANT JURY'S REQUEST FOR FURTHER INSTRUCTION

 Defendant contends he was prejudiced by the trial court's telling the jury, in response to the jury's request for an explanation of an instruction, that none of the instructions would be explained. He claims the court erred both in refusing to answer the particular inquiry and in precluding the jury from asking further questions about the instructions.

The jury commenced deliberations on the issues of guilt and special circumstances in the early afternoon. Shortly thereafter the jury requested, and was sent, certain exhibits and a copy of the jury instructions. At the end of the day, the jury submitted a note asking, "[C]ould we have defined whether 'the first degree murder' constitutes the act as a whole or the defendant's participation in said act. Please explain in A.M." The parties now agree that this question referred to the instruction defining deliberate and premeditated murder, CALJIC No. 8.20.

After the jury had been excused, the court stated to counsel: "A message was given to the Court by the jury asking for explanation of the jury instructions which, of course, is typical whenever you send instructions into the jury room. [¶] You are advised that the court is not going to explain any instructions. They either get it figured out for themselves or not. [¶] Every time a judge opens his big mouth and tries to explain what an instruction means, he puts his foot in it and the Appellate Court promptly bites it off. [¶] There will be no explanation of any of those jury instructions that went into that jury room, just so you know. That's what is going to be told to them."

Before excusing the jury, the court told counsel they need not be present when the jury reconvened the next morning. Defendant personally waived his right to be present at that time. When the jury reconvened at 9 a.m., the court told them as follows: "Ladies and gentlemen, also in addition to your request concerning an instruction, there is and can be no explanation of the instructions. You have to just work with them as they are printed. [¶] This

is one of the reasons we do not send, ordinarily, instructions into the jury room, because people start . . . picking them apart. [¶] You are going to have to consider the instructions as a whole as one of those instructions will . . . advise you, some of the instructions will apply, some of the instructions will not. [¶] All of those instructions have to be considered as a whole. Do the best you can with them." The jury then resumed deliberations and at 2 p.m. returned its verdict.

Defendant contends the court's refusal to further explain the instructions violated section 1138, which provides that when the jury "desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ." ■■ The court has a primary duty to help the jury understand the legal principles it is asked to apply. (*People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 250-251 [240 Cal.Rptr. 516].) This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1213 [275 Cal.Rptr. 729, 800 P.2d 1159].) Indeed, comments diverging from the standard are often risky. (E.g., *People* v. *Lee* (1979) 92 Cal.App.3d 707, 716 [155 Cal.Rptr. 128].) The trial court was understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given. This court did not do so.

■■ The error, however, was harmless. A violation of section 1138 does not warrant reversal unless prejudice is shown. (*People* v. *Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235].) Defendant has not shown prejudice.

There was no possible prejudice to defendant from the court's refusal to answer the jury's specific question "whether 'the first degree murder' constitutes the act as a whole or the defendant's participation in said act." The instruction on deliberate and premeditated murder (CALJIC No. 8.20), to which the question referred, described the mental states required for guilt of the "defendant" or the "slayer." The jury seems to have been wondering how those requirements would apply if "the defendant's participation in said act [of first degree murder]" was only as an aider and abettor. The aiding and abetting instructions, as already explained, authorized a guilty verdict against one who aided the perpetration of the murder with the intent to facilitate its commission, together with knowledge of the perpetrator's

criminal purpose. If the jury were to attempt to qualify the elements of guilt as an aider and abettor by including additional ingredients from CALJIC No. 8.20, the only likely prejudice would be to the prosecution, not the defense. Thus, defendant cannot have been prejudiced by the court's refusal to answer the jury's question.

Defendant also contends the court's response may have discouraged the jury from asking further questions. This, however, is speculation, not proof of prejudice. Nothing in the record suggests the jury was confused as to any other point of law, and certainly not adversly to defendant. As in *People* v. *Kageler, supra*, 32 Cal.App.3d at page 746, defendant has not shown prejudice.

### PENALTY PHASE EVIDENCE

Under stipulated arrangements to which defendant is objecting on appeal, the jury was discharged after returning the verdicts of guilt on the two murders with special circumstances, and another jury was empaneled to determine whether defendant should be sentenced to death or to life imprisonment without possibility of parole in light of the aggravating and mitigating factors set forth in section 190.3. To apprise the new jury of the circumstances surrounding the two murders of which defendant had been found guilty (§ 190.3, factor (a)), the prosecution presented most of the evidence it had introduced before the previous jury.

The only other subject on which the prosecution presented evidence was a prior homicide in Missouri. A court reporter read defendant's testimony at the Rutherford preliminary hearing in which defendant admitted having killed Laura Griffin by choking her with his hands, stabbing her in the throat, and holding her head under water. He said he had been drinking that evening and attributed the killing to his use of alcohol. He further admitted taking Griffin's purse and burning it in a trash can.

The prosecution then called two Missouri police officers to the stand. They told of finding Laura Griffin dead in her apartment on December 28, 1969. Her nude body was lying in the bathtub, which was full of bloody water. The body bore numerous knife wounds as well as marks apparently left by a garroting device around the neck. A pathologist testified she had died from loss of blood. He also identified photographs of the body, which were placed into evidence.

Defendant did not testify at the penalty trial, but the defense introduced additional parts of his testimony, as well as some testimony of Soria, which had been presented at the Rutherford preliminary hearing. Much of this

testimony dealt with the participation of Rutherford and others in the events leading up to the killings of Patty and Stacy, as well as the fear that defendant claimed as the motivation for his own participation. The testimony also revealed that defendant had spent seven years in a maximum security prison in Missouri.

Donald Clooney, a Missouri attorney, testified that defendant came to him in December 1969 and said he had killed a woman and needed help. After ascertaining that the police had no leads to the identity of the killer, Clooney recommended to defendant that he allow Clooney to surrender him to the police with a request that he be placed in a psychiatric ward. He gave defendant the option of going elsewhere for help, in which case his confession to the attorney would be kept confidential.

Defendant accepted Clooney's recommendation. Upon surrendering defendant, Clooney told the police orally and in writing that they were not to question defendant unless Clooney was present. Later Clooney negotiated a plea bargain under which defendant would plead guilty to the second degree murder of Griffin and be sentenced to 18 years' imprisonment on the condition that he receive psychiatric treatment while incarcerated. The plea was entered and the sentence imposed, but Clooney felt that Missouri failed to live up to the agreement to provide psychotherapy.

Defendant was paroled to California in July 1977. The parole conditions included psychiatric outpatient treatment. Unfortunately, after seven weekly sessions, the treatment was discontinued by the psychiatrist.

Defendant's brother and sister testified concerning defendant's family history. A supervisor at Hewlett-Packard in Palo Alto, where defendant worked as a machinist from February 1979 to April 1981, described defendant as a very good employee who was energetic, showed initiative, and would do more than was required of him. Two of defendant's instructors at the College of San Mateo described him as a model student and said they had reacted with disbelief upon first hearing that he had been arrested. A woman who had known him since 1979, and frequently dated him, thought he was a "pretty decent person" and that his arrest was out of character.

Douglas Gray, the attorney who initially had represented defendant in the present case but was replaced before the guilt trial, testified he had made an arrangement with the district attorney whereby defendant would testify against any of the other participants in the killings and, in return, would be tried last and would be protected from attack while in jail. (In addition to his testimony at Rutherford's preliminary hearing, defendant testified at the trial of Forrester.) A deputy sheriff assigned to the county jail testified that

defendant was a cooperative inmate. Finally, a forensic psychiatrist present-
ed extensive testimony concerning defendant's personality disorders.

## VIII. DENIAL OF INVESTIGATIVE FUNDS

■■■ Defendant contends the trial court erroneously denied his applica-
tion for $4,000, under section 987.9, to conduct an Amytal or sodium
pentothal interview to enhance defendant's memory of the crimes. He
claims the denial deprived his psychiatric expert of a full opportunity to
describe the origins of defendant's emotional and mental disturbance. How-
ever, the only purpose for the proposed procedure mentioned in the applica-
tion to the trial court was to assist in the cross-examination of Soria and
Forrester, who in fact never testified at defendant's trial. The application
did not state any need of an Amytal or sodium pentothal interview for
purposes of psychiatric evaluation.

Defendant's failure to state to the trial court his now asserted reason for
desiring the testing defeats his claim of error. He had the burden of showing
that the investigative services were reasonably necessary by reference to the
general lines of inquiry he wished to pursue, being as specific as possible.
(*Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 320 [204 Cal.Rptr. 165,
682 P.2d 360].) Although a motion for assistance should be viewed with
considerable liberality (*ibid.*), on appeal the trial court's order is presumed
correct. Error must be affirmatively shown. (*Id.* at p. 321.) Error is not
shown on appeal by urging reasons for the investigation not presented to the
court. The denial was not an abuse of discretion. (*Ibid.*)

## IX. PENALTY PHASE JURY SELECTION ISSUES

A. *Pretrial Stipulated Arrangement to Select Separate Juries for Guilt
and Penalty Phases*

At the outset of the guilt phase trial, before jury selection began, the
court explained to defendant that "the attorneys" had agreed to proceed
with trial of the guilt phase before one jury, and, if that jury found guilt and
the truth of the special circumstances, the trial of the penalty phase would
be before a different jury. The court asked defendant if he understood and
consented to that procedure, and he replied that he did. The court also told
defendant, "We do believe that it's in your best interests that we proceed in
that particular fashion."

Accordingly, the issues of guilt and special circumstances were tried
before a jury selected for only that purpose. After returning its verdict, the
jury was discharged, and a new jury was selected for the penalty phase.

Defendant now contends that the court had no jurisdiction to make a pretrial order for separate juries and, therefore, once the guilt phase jury was discharged no penalty trial could be held.

Section 190.4, subdivision (c), provides: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes."

In *People* v. *Superior Court* (*Rowland*) (1987) 194 Cal.App.3d 11 [239 Cal.Rptr. 257] (*Rowland*), it was held that under this statute, "a motion for a second jury may be entertained only after the first jury has convicted the defendant of a crime for which he might be subject to the death penalty. There is no room for a court's pretrial prediction, however enlightened, that a second jury may be needed . . . . [¶] The trial court was without jurisdiction to entertain a pretrial motion for a second jury." (*Id.* at p. 13.) Accordingly, the People were granted a pretrial writ of mandate to require the setting aside of an order granting the defendant's motion for separate juries.

Relying on *Rowland*, defendant contends that the trial court had no jurisdiction, prior to the commencement of his trial, to adopt the stipulated arrangement for separate juries. Thus, he argues, there was no valid basis for discharging the guilt phase jury and impaneling another jury for the penalty phase, and the judgment of death must be reversed. He cites *People* v. *Wojahn* (1984) 150 Cal.App.3d 1024 [198 Cal.Rptr. 277].

In *Wojahn*, the trial court mistakenly discharged a jury that had found the defendant guilty of various crimes but had failed to determine the truth of an alleged prior conviction. Over defense objection, the court instituted a new proceeding in which the prior conviction was found true. On appeal, the court was ordered to amend the judgment by striking the sentence enhancement based on the prior conviction; "double jeopardy considerations" were held to have "prohibited the impanelling of a new jury to try the issue of the prior conviction." (150 Cal.App.3d at pp. 1032-1035.) By analogy to *Wojahn*, defendant apparently contends that since, under *Rowland, supra*, 194 Cal.App.3d 11, the trial court lacked jurisdiction to decide, prior to the guilt phase, upon impanelment of a separate jury for the penalty phase of his trial, he is entitled to have the death penalty stricken permanently from the judgment, without any possibility of a new penalty trial.

To the contrary, the pretrial arrangement for separate juries was entirely proper. Unlike the orders set aside in *Rowland* and *Wojahn*, the

arrangement was agreed to, prior to trial, by both the prosecution and the defense, and implemented by order of the court pursuant to its discretion under section 190.4, subdivision (c). Nothing in the statute forbids impanelment of a new jury for the penalty trial under those circumstances.

■ Section 190.4, subdivision (c), does express a clear legislative mandate for the trial of both guilt and penalty by the same jury (*People* v. *Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 753 [114 Cal.Rptr. 467, 523 P.2d 267]), but it does not preclude other arrangements on a showing of good cause when approved by the trial court. "The preference for a single jury is by no means a one-sided matter; such a procedure may provide distinct benefits for both the prosecution and the defense. From the prosecution's point of view, the use of a single jury to determine both guilt and penalty may make it less likely that a juror's belief as to the inappropriateness of the death penalty will improperly skew the determination of guilt or innocence . . . . From defendant's perspective, the use of a single jury may help insure that the ultimate decision-maker in capital cases acts with full recognition of the gravity of its responsibility throughout both phases of the trial and will also guarantee that the penalty phase jury is aware of lingering doubts that may have survived the guilt phase deliberations." (*People* v. *Fields* (1983) 35 Cal.3d 329, 352 [197 Cal.Rptr. 803, 673 P.2d 680] [plur. opn. of Broussard, J.]; see *id*. at p. 374 [conc. opn. of Kaus, J.]; *Buchanan* v. *Kentucky* (1987) 483 U.S. 402, 417 [97 L.Ed.2d 336, 107 S.Ct. 2906]; *Lockhart* v. *McCree* (1986) 476 U.S. 162, 180-181 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

Section 190.4, subdivision (c) protects the prosecution and the defense against being deprived of the benefits of a single jury against either party's will. ■ It does not, however, require a single jury for both guilt and penalty phases when the parties agree that in their particular situation use of separate juries would be to their mutual advantage, and the trial court finds good cause to so order. (Cf. *People* v. *Harris* (1989) 47 Cal.3d 1047, 1075 [255 Cal.Rptr. 352, 767 P.2d 619] [use of dual juries for trial of two codefendants held a permissible practice].)

B. *Defendant's Absence During Portion of Jury Selection*

■ Defendant complains that a 20-minute portion of the jury selection proceedings was conducted in his absence. During the 20 minutes, 10 out of the 13 prospective jurors present were excused for hardship, by stipulation of counsel. Though the clerk's transcript indicates defendant was present, the reporter's transcript indicates that defendant's presence was waived by

his counsel. Defendant claims that his presence could not be waived and, even if waivable by him personally, could not be waived by counsel.

As a general rule, the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is upon him to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776].) In *People* v. *Grant* (1988) 45 Cal.3d 829, 846 [248 Cal.Rptr. 444, 755 P.2d 894], the capital defendant "declined to be present during the first half-hour of jury selection, at which time jurors were excused for physical disability or financial hardship." We said that "defendant's presence would have served little if any purpose . . . ." (*Ibid.*) The same is true here. Defendant speculates that had he been present, he might have assisted his attorney by objecting to the excusal of one or more of the jurors. His attorney obviously felt his presence would not be beneficial. As in *Grant*, no error appears.

## C. *Denial of Four Challenges for Pro-death Bias*

 Defendant claims prejudice from the denial of his challenges for cause of four prospective jurors on the ground they were unequivocally biased in favor of imposing the death penalty on defendant.

We have reviewed the record of the voir dire of each of the four prospective jurors. Although all gave conflicting answers regarding their ability to consider both penalty options available to them, all stated at one time or another that they could consider the option of life imprisonment without the possibility of parole. The trial court denied defendant's challenge for cause as to each. Where equivocal or conflicting responses are elicited, the trial court's determination of the prospective jurors' states of mind is binding on an appellate court. (*People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950]; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 103 [270 Cal.Rptr. 817, 793 P.2d 23].) On this record, we cannot say that, as a matter of law, the jurors' views on capital punishment would have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions and their oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Mason, supra,* 52 Cal.3d at p. 953.)

## D. *Peremptory Challenges of Jurors Who Disliked Death Penalty*

 Defendant claims he was deprived of an impartial jury because the prosecutor systematically used peremptory challenges to exclude

prospective jurors who showed any lack of enthusiasm for the death penalty. We have repeatedly rejected the contention. (E.g., *People* v. *Gordon, supra,* 50 Cal.3d at p. 1263.)

## X. ADMISSIBILITY OF THE MISSOURI HOMICIDE

### A. *The Facts*

As previously stated, the prosecution introduced, at the penalty phase, (1) evidence that Laura Griffin was the victim of a homicide in Missouri in December 1969 and (2) defendant's admissions at the Rutherford preliminary hearing that he had killed Griffin. This evidence was admitted to show an aggravating factor, "criminal activity by the defendant which involved the use or attempted use of force or violence." (§ 190.3, factor (b).) The prosecution introduced no evidence of any criminal proceedings against defendant for killing Griffin. The evidence of defendant's guilty plea to the second degree murder of Griffin, and of his imprisonment in Missouri and subsequent parole to California in 1977, was brought before the jury by the defense in response to the prosecution's evidence.

Before the penalty phase commenced, defendant sought unsuccessfully to prevent the jury from hearing any of the foregoing evidence. After return of the verdicts of guilt, he moved to exclude all references to the Missouri homicide, on the ground that his prior admissions, which were the only evidence relied on by the prosecution to connect him to that crime, resulted directly from violations of his constitutional rights. The following facts were presented through exhibits, testimony, and a stipulation at the hearing of the motion on October 26 and 28, 1983.

After being charged in Missouri with the murder of Griffin, defendant moved to suppress all his statements to the police as involuntary and illegally obtained, and all physical evidence obtained as a result of those statements. At the hearing on the motion in November 1970, the Missouri arresting officer testified that defendant had been surrendered by his counsel, who told the officer he did not want defendant to give the police any statements. The officer testified that after placing defendant in a psychiatric hospital, the officer visited defendant and questioned him about another crime, but did not talk to him or take any statement from him about the Griffin homicide. The officer said he learned of certain physical evidence in a trash can from defendant's friend, Sandy Columbo, before his visit to defendant.

Defendant testified that soon after being placed in the hospital, he was interrogated by the officer about the killing of Griffin and gave the officer

specific details about the crime and about physical evidence that might be found in a trash can near his house. The officer did not advise him of his right to counsel, and told him that his statements could not be used against him in court. Defendant told the officer he had divulged the details of the crime to Columbo, who had accompanied defendant and the police when he was taken to the hospital. He had told Columbo about the physical evidence in the trash can.

On November 19, 1970, the Missouri trial court denied defendant's motions to suppress. On December 8, defendant pleaded guilty to second degree murder and was sentenced to 19 years' imprisonment with credit for the nearly one year he had spent awaiting trial.

After defendant's confession to, and arrest for, the present murders in April 1981, his then counsel, Douglas Gray, made an agreement with the prosecutor, at defendant's instigation, that defendant would give a further statement and would testify at the trials of his codefendants, not in exchange for any reduction in penalty, but for assurances that best efforts would be made to ensure his physical safety in custody (since he would be viewed as a "snitch") and that his trial would follow those of the codefendants. Under informal questioning by the prosecutor in Gray's presence in January 1982—which was preceded by an admonition and waiver of the *Miranda* rights—defendant volunteered that he had told Rutherford about his conviction for murder in Missouri. Under questioning, he described how he had committed that crime. At the Rutherford preliminary hearing in January and February 1982, defendant testified to still further details of Griffin's murder. His last testimony in a codefendant's case was at the trial of Forrester in April 1982.

In late September 1982, investigators from the San Mateo County Sheriff's office went to Missouri to obtain further evidence of the murder of Griffin in 1969. They interviewed a number of witnesses including Sandy Columbo and the officer who had arrested defendant. The investigators reported that the arresting officer stated as follows: Upon surrendering defendant to the police, defendant's attorney, Donald Clooney, told the police not to talk to defendant. After Clooney left, the officer "conducted an interview" with defendant, who confessed to the murder and described physical evidence connecting him to the victim, and where such evidence could be found. Based on these statements, the officer obtained this evidence from a garbage can behind defendant's apartment. The officer said that during a suppression hearing in court, he "lied on the witness stand" about where and how he had obtained the evidence. Columbo had also told him where certain items of evidence had been found, and the officer testified that seizure of the evidence had been based on her statements.

One of the California investigators testified at the California suppression hearing that the arresting officer did not "specifically" say how he had lied at the Missouri hearing. Later, he testified the officer "told us that the attorney [for defendant] had told him not to speak with his client, question him. He waited for the attorney to leave and did so anyway." The investigator believed the officer also "somehow" lied on the witness stand regarding the recovery of the physical evidence implicating defendant. He did not "interrogate" the officer regarding the nature of the lies but instead "accepted his statement without specific context."

Upon receiving the investigators' report in October 1982, the prosecutor promptly delivered a copy of it to defendant's counsel, Gray. On December 1, 1982, the prosecutor held a lengthy telephone conversation with the Missouri officer. This time, the officer suggested that the incriminating conversation consisted of defendant "just volunteering" the information. The officer said that before he spoke with defendant, the Missouri police had no evidence linking defendant to the Griffin murder. The crucial physical evidence was obtained from a trash can in which defendant told the officer he had burned Griffin's purse. Laboratory tests of burned marks in the bottom of the can revealed Griffin's bank number. Columbo was present when defendant made his self-incriminating statements. Thereafter, the officer questioned Columbo, who said that defendant had told her what she heard him disclose directly. Thus, the evidence that the police planned to use to link defendant to the Griffin murder consisted of the physical evidence from the trash can and his admissions to Columbo. The prosecutor's detailed report of this conversation was promptly delivered to defendant's counsel.

In September 1983, counsel applied for a certificate for the attendance of out-of-state witnesses (§ 1334.3), with which the defense sought to subpoena two Missouri officers, including the one who had arrested and questioned defendant, as well as Columbo and Clooney, to testify at defendant's penalty trial in California. Counsel's declaration in support of the application stated that the witnesses were necessary to establish that defendant's confession to the Missouri police of the Griffin murder, and the physical evidence connecting defendant with that crime, were obtained as the result of an illegal interrogation. In opposition to the application, the California prosecutor declared to the Missouri court that he did not intend to introduce any evidence that defendant was convicted of the Missouri crime, or any statements made by defendant to Missouri officers, or any physical evidence obtained after the Missouri police learned that defendant was involved. He said he intended to introduce only testimony describing the scene of Griffin's death and the wounds disclosed by the autopsy, together with defendant's admissions of the crime to California sheriff's detectives and at

the Rutherford preliminary hearing. The Missouri court denied the application, ruling that none of the requested witnesses' proposed testimony was necessary or material to defendant's trial.

Attached as exhibits to defendant's California motion to exclude all evidence of the Missouri crime were (1) transcripts of the Missouri proceedings in 1970 concerning defendant's unsuccessful motion to suppress evidence and his subsequent guilty plea, (2) excerpts from defendant's statements to California sheriff's detectives and his testimony at the Rutherford preliminary hearing, all in January 1982, in which defendant admitted killing Griffin, and (3) the reports of the California sheriff's investigation in Missouri in September 1982 and the prosecutor's follow-up telephone conversation in December 1982, which revealed the admissions of the Missouri officer of his perjury in the 1970 suppression proceeding. At the two-day hearing in October 1983, it was stipulated that these exhibits could be received as correct copies of what they purported to be and could be considered as evidence of the truth of their contents. It was further stipulated that (1) defendant's confession to the Missouri officer of the homicide of Griffin was obtained in violation of the Fifth and Sixth Amendments to the United States Constitution, (2) the physical evidence of that crime (other than the body and the crime scene) was obtained as the direct unattenuated result of the unlawfully obtained confession, and (3) at the time of defendant's admissions of the Missouri murder in January 1982, neither defendant nor his attorney was aware of the grounds for vacating his Missouri conviction that were subsequently discovered by California investigators in September 1982 and by the prosecutor in December 1982.

Attorney Gray, who was still representing defendant in early 1982, testified that if he had known then of the perjury of the Missouri officer in the 1970 suppression proceeding, he would have done whatever he could to prevent defendant from giving any further statements to the police or the prosecution, or from testifying in the proceedings against any of his codefendants. Gray also testified, however, that defendant "indicated really almost enthusiasm for assisting the prosecution."

The prosecutor testified he believed the Missouri officer had committed perjury. In argument, he "concede[d] it's perjury." The motion to exclude all evidence of the Missouri homicide was then denied.

B. *Discussion*

Since defendant was not allowed to call as witnesses in the California hearing any of the Missouri officials, and the Missouri officer has admitted he lied on the witness stand, the record is not precise regarding what

occurred in that state. The only evidence we have about the nature of the officer's lies is his conversations with the California authorities, who did not ask probing questions. Defendant does not and cannot complain of this circumstance because the prosecution stipulated to the crucial facts. The important facts for our analysis regarding the events in Missouri are that defendant's confession was obtained in violation of his Fifth and Sixth Amendment rights, that the physical evidence implicating defendant in the Griffin murder was obtained as the direct unattenuated result of the unlawfully obtained confession, and that the officer committed perjury at the suppression hearing.

The prosecution here did not seek to present evidence of the Missouri confession or of any of the incriminating physical evidence. Rather, it proved the corpus delicti of the murder—which is clearly not tainted by the illegal conduct—and defendant's 1982 statements in California admitting the murder. Thus, the sole issue before us is whether the California statements were rendered inadmissible because of the misconduct in Missouri. We conclude they were not.

 In seeking to exclude evidence not directly obtained by illegal conduct, the defendant "bears the burden of making a prima facie case that such evidence was 'tainted' by—i.e., causally linked to—the primary illegality. [Citations.] This burden also is heavy. He must show more than that the challenged evidence 'would not have come to light *but for* the illegal actions of the police'; rather, he must establish that it ' "has been come at by *exploitation* of that illegality . . . ." ' (*Wong Sun* v. *United States* [(1963)] 371 U.S. [471], 488, italics added.) If the defendant makes this showing, the burden shifts to the prosecution to prove that the taint has been 'purged' and hence that the evidence is admissible in spite of the primary illegality. [Citations.]" (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1300 [248 Cal.Rptr. 834, 756 P.2d 221].)

 Incriminating statements by a defendant are admissible despite previous unlawful governmental conduct if they are "sufficiently an act of free will to purge the primary taint" (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 486 [9 L.Ed.2d 441, 454, 83 S.Ct. 407]), or, phrased differently, if the connection between the illegality and the confession "had 'become so attenuated as to dissipate the taint.' " (*Id.* at p. 491 [9 L.Ed.2d at p. 457], citing and quoting *Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 312, 60 S.Ct. 266].)

In *Brown* v. *Illinois* (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254], where the issue was the admissibility of a confession taken after an illegal arrest, the high court said: "The question whether a confession is the

product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive . . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of [the illegality]. But they are not the only factor to be considered. The temporal proximity of the [illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." (*Id.* at pp. 603-604 [45 L.Ed.2d at p. 427], citation and fns. omitted, quoted in *People* v. *Montano* (1991) 226 Cal.App.3d 914, 937-938 [277 Cal.Rptr. 327].)

 An analysis of the *Brown* factors (*supra*, 422 U.S. 590) convinces us that defendant's California statements were an act of free will, and any connection between them and the Missouri events was so attenuated as to dissipate the taint. The California statements were preceded by *Miranda* warnings (an "important factor"), and were made over 11 years after the illegal conduct with major intervening circumstances. They were far removed geographically, were initiated by defendant, and were taken by different authorities. Defendant had already voluntarily confessed to the two California murders, and, according to his own attorney, showed "almost enthusiasm for assisting the prosecution." There was never any suggestion of coercion, either in Missouri or in California.

"When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." (*Oregon* v. *Elstad* (1985) 470 U.S. 298, 310 [84 L.Ed.2d 222, 232-233, 105 S.Ct. 1285].) Each of these factors supports a finding of attenuation in this case, which is especially significant given the complete absence of actual coercion.

It is true that defendant's knowledge that he had already confessed and pleaded guilty to the Missouri murder gave him a false sense that he had nothing to lose in talking to the California authorities. This might have played a role in defendant's decision to speak, and certainly was crucial to his attorney's acquiescence in that decision. At most, however, this suggests that "but for" the illegality, defendant would not have confessed in California. As explained above, that is not the test. The strong factors in attenuation predominate.

Citing *Coleman* v. *McCormick* (9th Cir. 1989) 874 F.2d 1280, defendant argues the unlawful conduct improperly affected his attorney's advice on whether defendant should speak with the California authorities. Coleman was tried and sentenced to death under a mandatory death penalty law that was later declared unconstitutional. A new death penalty law was enacted

and applied retroactively to him. Coleman received a new sentencing hearing under the new law, but not a new guilt phase trial. The sentencing judge, who also presided over the original trial, imposed a new death penalty. The judge relied in part on evidence, including defense evidence, presented at the trial held under the unconstitutional mandatory law. The Ninth Circuit found this violated due process. "Coleman was sentenced to death under a statute not in effect at the time of his trial. The new statute added a sentencing 'trial' at which the sentencing judge could consider any evidence that came in during the guilt phase. By contrast, the old statute required the death penalty once a defendant was convicted of aggravated kidnapping. Coleman's counsel made countless tactical decisions at trial aimed solely at obtaining Coleman's acquittal, without even a hint that evidence in the record would be considered as either mitigating or aggravating factors." (*Id*. at p. 1289.)

*Coleman* considered whether a trial held under one set of rules can later be used to reach a sentencing verdict under a quite different set of rules, and concluded it cannot. Here, the issue is quite different—whether the unlawful police conduct tainted the confession. Resolution of the issue requires application of the attenuation rules of *Brown* v. *Illinois, supra*, 422 U.S. 590. Unlike *Coleman*, where the due process violation affected "countless tactical decisions" (874 F.2d at p. 1289), the effect of the unlawful conduct on the advice of counsel, although relevant, is not dispositive. Defendant's own enthusiasm for talking to the authorities minimizes the effect of this factor, and it does not overcome the factors in attenuation.

The only *Brown* v. *Illinois* factor (*supra*, 422 U.S. 590) that arguably supports suppression is the "particularly" important one of the "purpose and flagrancy of the official misconduct"; even this does not point unambiguously towards suppression. On the one hand, the Missouri officer's misconduct—including particularly the perjury—was egregious. Perjury is qualitatively different from ordinary search and seizure or *Miranda* violations. It "involve[s] a corruption of the truth-seeking function of the trial process." (*United States* v. *Agurs* (1976) 427 U.S. 97, 104 [49 L.Ed.2d 342, 350, 96 S.Ct. 2392].)

Perjury by law enforcement officials is particularly pernicious. Our entire criminal justice system is built around the belief, and necessity, that law enforcement officers will testify truthfully. Courts generally believe the testimony of such persons rather than that of the accused, as occurred in the Missouri suppression hearing. Deliberate, cynical perjury by law enforcement officials strikes at the very core of our system of law. It manipulates and thereby perverts the entire judicial process. "This is not a case where, in Justice Cardozo's words, 'the constable . . . blundered' . . . ." (*United*

*States* v. *Henry* (1980) 447 U.S. 264, 274-275 [65 L.Ed.2d 115, 125, 100 S.Ct. 2183], quoting *People* v. *DeFore* (1926) 242 N.Y. 13, 21 [150 N.E. 585, 587].) Instead, as a pernicious perjurer, the constable crumbled hallowed protections due the accused. It is this factor that makes this issue close and troubling.

On the other hand, the conduct of the California authorities—the ones who took the admitted statements—was exemplary. They scrupulously protected defendant's rights in California, and investigated and promptly reported the prior unlawful conduct. They served the citizens of this state well by effectively investigating and solving a serious crime while at the same time fully conforming to the law.

Suppression of the California confession would penalize the California authorities and the people they serve, not the Missouri officials. On balance, we find that defendant's California statements were acts of his free will under circumstances sufficiently attenuated from the earlier illegality as to dissipate the primary taint, despite the seriousness of that taint. Thus, the trial court did not err in admitting the statements.

## XI. EVIDENCE OF CODEFENDANTS' CULPABILITY AND SENTENCES

■ Defendant complains that the trial court excluded evidence of the dispositions of the charges against the other participants in the murders. Rutherford was sentenced to life imprisonment without possibility of parole for the murder of Stacy, the same sentence the jury imposed on defendant for that crime. Rutherford was acquitted of the murder of Patty, at which crime he had not been present. Forrester was acquitted of Patty's murder; Soria pleaded no contest to second degree murder; and the complaint against Geddling was dismissed for lack of evidence. Such evidence, however, is irrelevant to the penalty determination, which focuses on whether the defendant before the jury should be sentenced to death. (*People* v. *Carrera, supra*, 49 Cal.3d 291, 343.)

In response to the dissent's view that it is "irrational" to subject only defendant to the death penalty, and not the others involved in these crimes, we note that, unlike some of the others, defendant was an active participant in *both* murders of this case, and he alone committed the brutal murder in Missouri.

Defendant also contends the court should have admitted testimony of Soria (given in a prior proceeding) that (1) Rutherford and Geddling discussed a plot to kill an individual named Bill Quick and (2) Soria wrote a poem after her arrest that seemed to express pride in the two murders.

Defendant argues the evidence pertained not only to relative culpability but also to Rutherford's and Soria's "foul character," justifying defendant's fear for his life. Defendant, however, was not present during the discussion involving Quick. The poem arguably showed Soria's state of mind after the crimes, but that was not relevent to determining defendant's culpability. The court did not abuse its discretion in excluding the evidence.

Defendant next complains that in Rutherford's trial, the jury was instructed that it "may" rather than "shall" impose the death penalty if aggravating outweighed mitigating circumstances. He also asks us to judicially notice still another penalty phase trial in the same county in which the court allegedly told the jury it could consider the fact that an equally culpable codefendant was allowed to plead guilty to being an accessory, for which the codefendant was sentenced to only two years in jail. However, neither trial court ruling established a rule of law for this case. The propriety of the instructions of this case must be considered on its own merits, not by comparison to instructions in some other case.

We have repeatedly upheld trial courts' refusals to inform penalty trial juries of the punishments imposed on the defendant's accomplices. (*People* v. *Malone* (1988) 47 Cal.3d 1, 53-54 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 811-813 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 69-71 [246 Cal.Rptr. 209, 753 P.2d 1]; see also *People* v. *Gallego* (1990) 52 Cal.3d 115, 201 [276 Cal.Rptr. 679, 802 P.2d 169].) (The propriety of the court's use of the word "shall" is discussed below.)

## XII. DAVENPORT/LOCKETT CONTENTIONS

The prosecutor's pretrial notice of aggravating evidence included proposed proof of the absence of mitigating factors (d), (e), (f), (g), (h), (j) and (k), listed in section 190.3. Over defense objection, the prosecutor was permitted to argue aggravation on that basis. Two years later, in *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861], we held that "in the future," prosecutors should not be permitted to argue that the absence of mitigating factors is "automatically" aggravating. Despite the reference in *Davenport* to the "future," we have subsequently applied the rule to cases tried before the decision. (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184 [259 Cal.Rptr. 701, 774 P.2d 730].)

The Attorney General argues that the prosecutor did not claim that the absence of a mitigating factor is "automatically" aggravating, but merely aggravating under the facts of the case. Our review of the record, however, discloses that on more than one occasion, the later *Davenport* rule

was violated. Nevertheless, the error was harmless for reasons we have repeatedly stated in the past. (*People* v. *Gallego, supra*, 52 Cal.3d at pp. 200-201; *People* v. *Gonzalez, supra*, 51 Cal.3d at p. 1234.)

In addition, this was not a close case on the question of penalty. Defendant actively participated in two brutal murders. This was compounded by the compelling aggravating factor of the Missouri murder of several years earlier. Defendant admitted choking and stabbing the victim, and holding her head under water. Given these facts, there is little chance the jury would give significant weight to the absence of mitigating factors.

Defendant makes several additional related contentions we have repeatedly rejected: the court erred in not deleting any assertedly inapplicable statutory factors (*People* v. *Malone, supra*, 47 Cal.3d 1, 47); the court's instructions, and prosecutor's argument, under section 190.3, factor (d) (extreme mental or emotional disturbance), factor (f) (reasonable belief in moral justification or extenuation), and factor (g) (extreme duress or substantial domination of another person) deprived him of his right, under *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], to have the jury consider all evidence offered in mitigation (*People* v. *Medina* (1990) 51 Cal.3d 870, 908 [274 Cal.Rptr. 849, 799 P.2d 1282]); it was error to instruct the jury to consider factor (i), the "age of the defendant at the time of the crime," and for the prosecutor to argue that defendant's age—37 at the time of the present crimes—was aggravating, not mitigating (*People* v. *Medina, supra*, 51 Cal.3d at pp. 908-909; *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052]); and the court erred in refusing defendant's request for an instruction listing a large number of specific mitigating circumstances (e.g., that he was an industrious employee, a model college student, and had been honorably discharged from the Air Force) for the jury to take into account (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1276-1277 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Howard* (1988) 44 Cal.3d 375, 439-443 [243 Cal.Rptr. 842, 749 P.2d 279]). We decline defendant's invitation to reconsider these issues.

XIII. ALLEGED MISCONDUCT IN ARGUMENT TO JURY

The prosecutor argued to the jury that defendant had no remorse for his crimes and added: "Since you only heard the defendant through the tape recorder and his previous testimony, you were not able to observe his demeanor and sincerity at the time he testified so you, too, could judge if there was any feeling in the man." The prosecutor also said the jury could evaluate defendant not only from his statements but also from his demeanor in the courtroom.

■ Defendant contends that this argument commented on his failure to testify at the penalty phase, in violation of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. But the prosecutor was entitled to comment on the lack of remorse in defendant's prior statements and testimony in whatever form they were brought before the penalty jury (*People* v. *Williams* (1988) 44 Cal.3d 883, 966 [245 Cal.Rptr. 336, 751 P.2d 395]), and to comment on defendant's facial demeanor as he sat in the courtroom (*People* v. *Heishman* (1988) 45 Cal.3d 147, 196-197 [246 Cal.Rptr. 673, 753 P.2d 629]).

Defendant further contends that the argument improperly invoked lack of remorse as an aggravating factor. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-775 [215 Cal.Rptr. 1, 700 P.2d 782].) This contention is undermined by the fact that three defense witnesses—defendant's brother, former attorney, and psychiatric expert—all testified on the subject of his remorse, if any. Thus, the prosecutor did not introduce the subject and was entitled to comment on the testimony. (See *People* v. *Heishman, supra*, 45 Cal.3d 147, 189-190.)

■ Defendant finally contends the prosecutor violated the rule of *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207] by referring to the impact the murders would have on the victims' friends and relatives. But neither case bars brief references to the victims or their families. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 480 [276 Cal.Rptr. 356, 801 P.2d 1107].) The prosecutor referred to the "unbearable pain" defendant inflicted on the friends and relatives of the victims and their difficult "journey" when they paid their last respects. As in *Anderson*, these references to the victims were far more fleeting than those made in either *Booth* or *Gathers*, and merely reiterated what the jury already knew—that murder is a crime against the victims, their families and society. (*Ibid.*) In addition, even if there were error, it was harmless beyond a reasonable doubt. The brief comments could not have diverted the jury from its task of determining the appropriate punishment. (*Ibid.*)

## XIV. BROWN CONTENTION

■ Defendant contends he was prejudiced by the court's instructing that the jury "shall impose a sentence of death" if it concludes that the aggravating circumstances outweigh the mitigating circumstances (§ 190.3) because of the alleged absence of safeguards prescribed in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440]. In addition, however, the court gave special instructions substantially similar to those in *People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750

P.2d 741]. Nothing in the penalty phase arguments could have misled the jury to defendant's prejudice. The prosecutor correctly explained that the jury had to determine the "relative weight" of the aggravating and mitigating factors, not merely count the number of factors on each side. The fact that the jury returned a death verdict for only the murder of Patty, and not the murder of Stacy, indicates an individualized, rather than a mechanical, approach to its task. Reviewing the record as a whole, we conclude the jury was not misled regarding its duties. (*People* v. *Boyde* (1988) 46 Cal.3d 212, 252-255 [250 Cal.Rptr. 83, 758 P.2d 25], affd. *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *People* v. *Hayes* (1990) 52 Cal.3d 577, 641-643 [276 Cal.Rptr. 874, 802 P.2d 376].) Because of this conclusion, we need not decide whether we should reconsider *Brown* in light of recent United States Supreme Court decisions. (See *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1231, fn. 30.)

On motion for new trial, defendant offered an affidavit of a juror that the disputed instruction (that the jury "shall" rather than "may" impose death if aggravating outweigh mitigating factors) affected his penalty verdict. However, Evidence Code section 1150, subdivision (a), excludes such evidence of a juror's mental processes. (*In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260].) Defendant contends that this statutory exclusion has been constitutionally abrogated by article I, section 28, subdivision (d) of the California Constitution, forbidding the exclusion of relevant evidence in any criminal proceeding. We need not decide the point, for the crime of this case occurred before the effective date of that provision. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

## XV. CONTENTIONS REGARDING RESPONSES TO JURY QUESTIONS

### A. *Alleged Failure to Advise Counsel of Note From Jury*

A juror sent a note to the court, apparently before the case was submitted to the jury, asking a set of questions as follows: (1) Can conditions be placed on the penalty? (2) Can the jury request additional testimony? (3) What sentence would result from a hung jury? (4) How long will the jury be allowed to deliberate? (5) May the jury request additional psychological tests on defendant or his crime partners? (6) May the jury see the testimony of the codefendants?

Defendant filed a postjudgment motion to settle the record, contending that defense counsel were unaware of this note from the jury until after the trial. At a hearing on the motion, all defense counsel testified that they did not recall having seen the note during the penalty trial; that if they had seen

it, they would have remembered it because of the significance of its contents; and that it might have affected their conduct of the defense. The prosecutor testified he recalled seeing the note and a similar one during the trial, and that there was "at least some comment" about the notes between him and one of the defense attorneys. The judge denied the motion, stating, "It is inconceivable to me that defense counsel as well as the prosecution were not made aware of the questions addressed to the court."

 On appeal and in a separate motion (see *People* v. *Williams, supra,* 44 Cal.3d 883, 921), defendant asks us to overturn the trial judge's determination that defense counsel had been made aware of the note. The settlement of the record, however, is primarily a question of fact to be resolved by the trial court. (*People* v. *Mitchell* (1964) 61 Cal.2d 353, 371 [38 Cal.Rptr. 726, 392 P.2d 526].) Once settlement is ordered, the trial court has broad discretion to accept or reject counsel's representations in accordance with its assessment of their credibility. (*People* v. *Gzikowski* (1982) 32 Cal.3d 580, 585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].)

The court did not abuse its broad discretion. In addition to the court's own recollection and the deputy district attorney's testimony, another circumstance supports the finding. Upon excusing the jury on the last day on which they heard evidence, the court referred to "some questions concerning the instructions" it had received. A comparison of the court's subsequent comments with the note at issue suggests strongly the court was discussing that note. Defense counsel did not suggest in any way they were ignorant of the questions the court was discussing. We find no basis upon which to overturn the court's resolution of the conflicting evidence.

B. *Response to Jury Note re Psychiatric Help in Prison*

On the second day of penalty deliberations, the jury sent the court this note: "Would Don [defendant] receive either 'group attack' therapy or psychiatric help if given life without parole?" The judge immediately responded: "Disposition by the Department of Corrections is not a part of the decision you must make. This court has no jurisdiction over the Department of Corrections." The next day, both the note and the court's response were read to defense counsel, and they were invited "to add anything or instruct the jury to anything else regarding that question . . . ." Counsel answered in the negative.

Defendant concedes that he has waived the procedural irregularity of the court's initial ex parte response. (*People* v. *Chagolla* (1983) 144 Cal.App.3d 422, 432-433 [193 Cal.Rptr. 711].) He argues, however, that any

complaint regarding the *content* of the court's response has not been waived, and that the response was error.

Defendant's psychiatric expert, Dr. Wilkinson, had testified that defendant's antisocial personality disorder might be improved through psychiatric help, particularly "attack therapy," though the doctor conceded on cross-examination that because of budgetary constraints, psychotherapy is usually not available to the general prison population. Defendant argues that the court's statement to the jury misled it into thinking it should disregard any possibility of his being rehabilitated through whatever psychiatric help would in fact be available in prison.

We disagree. The court correctly stated that the jury could not control or determine any aspect of defendant's treatment in prison, and it should not speculate on the conditions in prison. (*People* v. *Anderson, supra,* 52 Cal.3d at p. 482.) When read together with the question to which it responded, the statement did not tell the jury to disregard the evidence it heard, or to disregard any possibility of rehabilitation. Defense counsel's approval of the response as given bars the contention that the court should have elaborated upon it to avoid possible misunderstanding. (*People* v. *Medina, supra,* 51 Cal.3d at p. 902.) If defendant had wanted further clarification, he should have proposed it when given the opportunity. (*Ibid.*)

## XVI. EXCESSIVE SPECIAL-CIRCUMSTANCE FINDINGS

 Defendant was charged with two multiple-murder special circumstances (§ 190.2, subd. (a)(3)), one in connection with each crime. This was erroneous. (*People* v. *Warren, supra,* 45 Cal.3d 471, 489.) We have consistently found such double counting harmless because it did not result in the jury considering any inadmissible evidence. The jury knew there was a total of two murders. (*People* v. *Odle* (1988) 45 Cal.3d 386, 421-422 [247 Cal.Rptr. 137, 754 P.2d 184].) It is even more clearly harmless here since the jury returned a separate penalty verdict as to each murder. Each verdict form had only one multiple-murder finding attached to it. The jury imposed the death penalty only as to one of the murders.

Defendant also contends the erroneous findings of the witness-killing special circumstance were prejudicial. Again, however, the jury properly considered all the *evidence,* including the motives for the murders. The court instructed the jury not to merely count the number of factors but to give each the weight to which it was entitled. We cannot conclude the jury could reasonably have given the inapplicable special circumstances any significant independent weight. (*People* v. *Benson, supra,* 52 Cal.3d at p. 793; *People* v. *Silva, supra,* 45 Cal.3d at pp. 632-636.)

## XVII. Constitutionality of Death Penalty Statute

■ Defendant contends the 1978 death penalty law is unconstitutional. We have repeatedly rejected such contentions, and continue to do so. (E.g., *People v. Douglas* (1990) 50 Cal.3d 468, 541 [268 Cal.Rptr. 126, 788 P.2d 640]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; see also *Boyde v. California, supra,* 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

### Conclusion

The excess multiple-murder special circumstance and both witness-killing special circumstances are set aside, and the judgment is otherwise affirmed.

Lucas, C. J., Panelli, J., Kennard, J., and Baxter, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. After review, I have found no error warranting reversal on those issues.[1]

I dissent from the judgment, however, as to the penalty of death. My reasons are two in number.

The first is that the admission of the evidence of the Missouri homicide was reversible error.

As to whether or not error was committed, the facts are undisputed. Captain Jack Patty of the St. Louis (Missouri) County Police Department deliberately violated defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution when he sought, and obtained, a confession relating to the murder of Laura Griffin. Patty then intentionally perjured himself at a hearing to suppress the confession in order to cover up his illegal conduct. Patty's violation of defendant's constitutional rights, and his subsequent perjury at the suppression hearing, tainted the evidence of the killing.

The question to be resolved can be stated simply: Was the taint purged?

The answer is clear—and it is negative. Whatever "purgative" force might have inhered in the actions and events following Captain Patty's illegal conduct, it must be deemed ineffectual. The reason is plain: Patty's misconduct—the deliberate violation of a defendant's federal constitutional

---

[1] In passing, I note that the trial court erred by refusing the jury's request for further instruction on the law—and erred egregiously. Under Penal Code section 1138—which was enacted in 1872 and has remained substantially unchanged since—the court is *required* to satisfy such a request. (E.g., *People v. Gordon* (1990) 50 Cal.3d 1223, 1259 [270 Cal.Rptr. 451, 792 P.2d 251].) On this record, however, no prejudice appears. All the same, I feel compelled to note the impropriety and to state my strong disapproval.

rights, and the subsequent intentional perjury to cover up the illegality—was most flagrant and grievous; the taint flowing therefrom was accordingly very dark and deep. I need not state what is apparent for all to see. Patty's actions do not constitute a mere misstep involving some so-called "technicality." Rather, they amount to a purposeful attack not only on the truth-seeking function of the system of adjudication but also on the very rule of law itself.

Turning from the fact of error to its consequences, I believe that reversal is required under either of the potentially applicable standards for harmless-error analysis, viz., the "reasonable doubt" test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], which governs federal constitutional error, and the "reasonable possibility" test of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135], which governs state law error occurring at the penalty phase of a capital trial.

The evidence introduced at the penalty phase showed that defendant was an excellent employee, a model student, and in general a decent and law-abiding citizen. It also showed that he participated in the brutal murder of Patty Geddling and Stacy Benjamin. In early 1981 he befriended Ricki Soria and attempted to free her from drugs and the drug underworld, including such characters as Frank Rutherford, William Forrester, and Ed Geddling. Two months later, at their urging, he became involved with Soria and the others in the killings. Aside from the Missouri homicide, there had been no other criminal activity on defendant's part.

The question of penalty must be considered close. To be sure, the evidence in aggravation was substantial. But substantial too was the evidence in mitigation. The closeness of the question is apparent on the face of the record. And it is confirmed by the manifest difficulty the jury experienced in reaching its decision—it deliberated almost 23 hours over 4 days—and by the differing verdicts it returned—death for the murder of Geddling and life imprisonment for the murder of Benjamin.[2]

In view of the foregoing, I believe that there is a reasonable possibility that but for the erroneous admission of the evidence of the Missouri homicide, the outcome would have been more favorable to defendant. Hence, I cannot conclude that the error was harmless beyond a reasonable doubt.

My second reason for dissenting as to penalty is the presence of so-called "intracase" disproportionality violative of the cruel and unusual punish-

---

[2] The majority's assertion, "this was not a close case on the question of penalty" (maj. opn., *ante*, at p. 113), assumes that the evidence of the Missouri homicide was properly admitted. Even if the assumption were sound, the assertion would be highly dubious, at the very best. But since, as explained above, the assumption is without support, so too is the assertion.

ments clause of the Eighth Amendment to the United States Constitution. Defendant, Rutherford, Forrester, Soria, and Ed Geddling were all engaged in the common criminal enterprise that culminated in the two murders. Nevertheless, only defendant was condemned to death.

I recognize that "intracase" disproportionality may be found only if the capital punishment system has operated in an arbitrary and capricious manner. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *McLain* (1988) 46 Cal.3d 97, 121 [249 Cal.Rptr. 630, 757 P.2d 569].) Plainly, the system operated in such a manner here. It would indeed have been rational to subject defendant and the others to severe punishment for the two murders. It would even have been rational to treat each of the participants somewhat differently on the ground that each engaged in distinct conduct and entertained a distinct state of mind. But— put simply—it is altogether irrational to take the life of defendant in punishment for the killings and to spare the lives of all the others.

For the reasons stated above, I would reverse the judgment of death.

**BROUSSARD, J.**—I concur in the majority opinion with regard to the judgment of guilt and the special circumstance findings, but, for the first reason discussed in Justice Mosk's opinion, I dissent from the majority's affirmance of the penalty judgment. As the majority opinion acknowledges, the United States Supreme Court established in *Brown* v. *Illinois* (1975) 422 U.S. 590, 603-604 [45 L.Ed.2d 416, 427, 95 S.Ct. 2254], that a primary factor to be considered in determining whether subsequently obtained evidence is tainted by a prior illegality is "the purpose and flagrancy of the official misconduct" at issue. (See generally 4 LaFave, Search and Seizure (2d ed. 1987) § 11.4(b), pp. 395-398, and cases cited.) Given "the purpose and flagrancy" of the Missouri police officer's misconduct in the 1970 Missouri proceedings and the evident causal relationship between that misconduct and defendant's subsequent admissions in the California proceedings, I believe the trial court erred in admitting evidence of the Missouri offense at the penalty phase of defendant's trial. Further, as Justice Mosk explains, in light of the substantial mitigating evidence presented on defendant's behalf at the penalty phase, the erroneous admission of the Missouri evidence was clearly prejudicial. Accordingly, I would reverse the penalty judgment and remand for a new penalty trial, to ensure that the decision whether defendant should live or die is made free of the taint of egregious police misconduct.

Appellant's petition for a rehearing was denied June 5, 1991, and the opinion was modified to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.