Filed 5/17/13  P. v. Holloway CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD HOLLOWAY,<br><br>    Defendant and Appellant. | A135885<br><br>(City & County of San Francisco Super. Ct. No. 10001941) |

Edward Holloway was charged with murder and convicted of three lesser offenses: involuntary manslaughter; assault with a deadly weapon and infliction of great bodily injury; and battery with infliction of serious bodily injury. (Pen. Code, §§ 192, subd. (b), 243, subd. (d), 245, subd. (a)(1), 12022, subd. (b)(1), 12022.7, subd. (a).)[1] The court sentenced defendant to seven years in prison on the assault count and stayed sentence on the remaining counts.[2] Defendant appeals upon contentions that the trial court erred in (1) refusing a special instruction on causation related to his claim that a superseding intervening cause was responsible for the victim's death; (2) responding to

---

[1] All further section references are to the Penal Code.

[2] "An act or omission punishable in different ways by different provisions of the law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." (§ 654, subd. (a).) The term of imprisonment for manslaughter or assault with a deadly weapon are the same — two, three or four years. (§§ 193, subd. (b), 245, subd. (a)(1).) Here, the assault coupled with the three-year enhancement for great bodily injury (§ 12022.7, subd. (a)) was the longest potential term of imprisonment.

1

jury questions during deliberations by referring the jury to the standard instructions on causation without further elaboration; and (3) refusing to give an adverse inference instruction based on the fact that police testing of drug residue found in the victim's apartment consumed the residue and precluded testing by the defense. We shall affirm the judgment.

## STATEMENT OF FACTS

Defendant arrived at Carl's Jr., a fast-food restaurant on Seventh and Market Streets in San Francisco, after midnight on January 16, 2010. A restaurant cashier testified that defendant was drunk, "abusive," and "carrying on" by asking for money and food and shouting "motherfucker" and other "bad names" at customers in "a loud tone." Defendant was carrying a large radio, or "boom box," that was playing loud music. Defendant was asked to leave because "he was making a lot of noise." A restaurant security guard tried to eject defendant, without success. Defendant remained at the restaurant and continued his abusive behavior for 15 or 20 minutes before the victim, Matthew Adams, arrived.

Adams arrived at the restaurant with his girlfriend, Melissa Degrio. Degrio testified[3] that Adams was a drinker and drug user. He was intoxicated when the couple went to the restaurant, having consumed a fifth of vodka. Adams was also in the habit of crushing methadone pills he bought on the street and drinking them with water. Degrio did not know if Adams took any methadone in the hour or so they were together before going to the restaurant.

When the couple arrived at the restaurant, defendant was at the counter screaming "violent stuff" and loudly shouting "I'm ready for war." Adams and Degrio ordered food at the counter, then sat in a booth. Defendant approached the booth and, according to the cashier, made negative "comments" about Degrio "because of the dress she was wearing and how she was looking." Degrio testified that defendant called her a "bitch." Adams

---

[3] Degrio was unavailable for trial; her preliminary examination testimony and a police statement were read to the jury.

became angry, stood and walked over to defendant. The cashier heard defendant ask Adams "Are you challenging me?" Before Adams could respond, defendant swung his boom box at Adams's head, striking Adams on the right temple. The boom box weighed seven pounds and struck Adams with such force that the back panel of the radio opened and the batteries spilled out. Degrio testified that the blow knocked Adams unconscious and he fell to the floor, where he struck his head. Defendant left the restaurant.

Adams lay unconscious on the floor for about two minutes, as confirmed by a videotape of the incident. When he gained consciousness, he was incoherent and sweating profusely. The police were called and arrived to find Adams seated at a table. The investigating police officer did not see any outward sign of injury to Adams but noted that he was slow to respond and appeared to be in a "stupor." The officer also noted that Adams's pupils were constricted, which was consistent with being under the influence of an opiate. The police urged Adams to seek medical attention but he refused.

Another police officer located defendant on the street, carrying a boom box, and detained him. The officer told defendant she was investigating an assault at Carl's Jr. and defendant replied, "I hit him. I got fast hands. I'm an old man. I'm 55." The officer testified that defendant also said that "he hit Mr. Adams because Mr. Adams was a big man and he was a little man, and he was afraid of Mr. Adams because Mr. Adams was stepping up to him. So he hit him with his radio first."[4] The officer released defendant after being advised that Adams did not want police assistance and left the scene.

Adams and Degrio walked a half block to Adams's studio apartment. Degrio testified that Adams was not well. He was "sweating so bad" it "looked like he was in the shower" and his memory was "going in blinks" as he repeatedly asked Degrio what happened. Degrio would tell Adams what happened and, two minutes later, he would ask again. Adams said bells were ringing in his head and he started to vomit. Adams lay on the floor and refused Degrio's pleas that he get medical help. Degrio was with Adams at

---

[4] Adams was 5 feet, 10 inches tall and weighed 190 pounds. He was 38 years old. Defendant's height and weight does not appear in the record.

his apartment for an hour or two when Adams told her to stop "fussing" and go to her apartment to get their dog. Degrio did as he asked: she walked a few blocks to her apartment and returned immediately to Adams's apartment with the dog.

When Degrio returned, Adams did not answer the intercom buzzer or telephone. Degrio did not have a key to Adams's gated apartment building and the security guard would not admit her. Degrio went home and repeatedly telephoned Adams but received no answer. Degrio was worried because Adams was in the habit of calling her often, "literally every 30 minutes." Degrio called the building management office but they refused help. Finally, at about 8:30 p.m., Degrio convinced a building security guard to admit her to Adams's apartment. Degrio walked in to find Adams dead on the floor in the same position she left him earlier that day.

The police were called and, at first, thought Adams might have died from a drug overdose. A bedside table contained 13 loose pills, several of them cut and broken, next to a hand-held mirror with crushed powder on it. The broken pills and powder were later tested and determined to be methadone. Degrio said Adams liked to crush his methadone pills and drink them with water so the drug would "hit him faster." She believed the crushed pills were "probably" there when the couple returned from Carl's Jr. but could not be sure.

A forensic pathologist, Ellen Moffat, examined Adams at his apartment and later conducted an autopsy. Dr. Moffat testified that Adams had been dead for "some hours" before he was discovered. The autopsy showed a skull fracture and underlying epidural hematoma — "a collection of blood between the skull and the tough covering of the brain called the dura." Dr. Moffat opined that Adams died "as a result of blunt force injuries to his head" sustained at the restaurant — the initial blow to the right side of his head having knocked him to the floor, he sustained a lethal injury to the left side of his head in hitting an object on his way to the floor or when he hit the floor. The pathologist testified that epidural hematomas are commonly caused by blunt trauma to the head and, in this case, resulted from a tear in the left meningeal artery. Blood from the torn artery collected in the space between the skull and the dura, leading to brain compression,

4

deprivation of oxygen to the brain, and death. Alcohol, cocaine and methadone were present in Adams's blood at the time of his death but were not the cause of death, the pathologist testified. The alcohol and drugs were contributing factors but the blow to the head was the "lethal mechanism." Dr. Moffat testified that "the epidural hematoma was large enough, in and of itself, to bring about someone's death and certainly caused enough injury to the brain to cause it to swell, cutting off oxygen to the brain, bringing about the death of Mr. Adams."

A forensic toxicologist testified that Adams had .9 milligrams of methadone per liter in his blood when examined. Methadone is a synthetic opiate developed for pain management and prescribed to rehabilitate heroin addicts but also widely used as an illegal street drug. Adams's methadone level was "very high" and at a level that "could easily be the cause of death" in a non-tolerant individual. However, the toxicologist cautioned that methadone is "a very tricky drug" and that "any number in isolation means nothing" because "[p]eople with methadone exposure, chronic methadone exposure, build significant tolerance. And they can tolerate concentrations of the drug that could instantly kill a naïve user." Laboratory tests showed that Adams was not "a naïve user" — methadone was detected in his urine indicating prior use but the extent of that use could not be scientifically determined. The toxicologist testified that Adams's methadone use was a factor to consider among the "totality of circumstances" in determining the cause of death. The toxicologist said the forensic pathologist was the one to assess the circumstances in determining the cause of death, which was a determination he was not qualified to make. He relied upon Dr. Moffat's evaluation of the case and her determination that Adams died from an epidural hematoma, not a methadone overdose, and refused to disagree with that determination.

## DISCUSSION

1. *The trial court properly refused a special instruction on causation*

Defendant contends the trial court erred in refusing a special instruction on causation which he asserts was needed to evaluate his claim that a superseding

intervening cause was responsible for the victim's death. Among the defenses offered at trial, defendant claimed that Adams did not die from head wounds but from a drug overdose he took after being hit by defendant at the restaurant. In was undisputed that Adams used methadone sometime on January 15th or 16th. The prosecution suggested that Adams used methadone before he went to the restaurant and, in any event, it was a blow to the head not the drug that killed him. The defense argued that Adams took a lethal dose of methadone after he returned home from the restaurant, emphasizing the large quantity of methadone found during the autopsy and Degrio's inability to state with certainty that the crushed methadone pills found in his apartment when his body was discovered had been there earlier in the day. Defendant requested a special instruction on causation, which was refused in favor of standard instructions on the subject. The refusal was proper.

Standard jury instructions are approved for use as the "official instructions for use in the State of California" after an exhaustive vetting process to ensure accuracy, comprehensiveness, and comprehensibility. (Cal. Rules of Court, rule 2.1050.) Use of these standard instructions "is strongly encouraged." (Cal. Rules of Court, rule 2.1050(e).) The standard instructions accurately and fully set out the applicable legal principles on causation, including the concept of an intervening cause.

The standard instructions that were given provided, in relevant part, as follows: "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a crime or a lawful act in an unlawful manner; [¶] 2. The defendant committed the crime or act with criminal negligence; AND [¶] 3. *The defendant's acts unlawfully caused the death of another person.* [¶] . . . [¶] *An act causes the victim's death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.* In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (CALCRIM No. 580, italics added.) As to causation, the jury was further instructed: "There may more than one cause of death. *An act causes death only if it is a*

6

*substantial factor in causing the death.* A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes death. [¶] The failure of Matthew Adams or another person to use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though Matthew Adams or another person may have failed to use reasonable care. [¶] *If you have reasonable doubt whether the defendant's act caused the death, you must find him not guilty.*" (CALCRIM No. 620, italics altered.)

With these instructions the jury was well-equipped to consider defendant's claim that Adams died from a drug overdose taken after he was hit on the head. The jury was told that defendant was not responsible for Adams's death unless defendant's act of striking Adams was "a substantial factor causing the death," the death was "the direct, natural, and probable consequence of the act," the death "would not have happened without the act" and "nothing unusual" intervened between defendant's act and Adams's death. (CALCRIM Nos. 580, 620.)

Defendant's requested special instruction was properly refused. The requested instruction was as follows: "The prosecution must show that a criminal act performed by the defendant was a direct cause of the victim's death and that death was the natural and probable consequence of the defendant's act. [¶] An act causes the victim's death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] If you find that the People proved that [defendant] Edward Holloway's act was a direct cause of Matthew Adams's death in that it was the natural and probable consequence of Edward Holloway's act, you must also consider the following: [¶] The failure of Matthew Adams or another person to use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though

7

Matthew Adams or another person may have failed to use reasonable care. [¶] Edward Holloway claims that he is not responsible for Matthew Adams's death because he claims that Mr. Adams's subsequent conduct was grossly improper and caused his death. In deciding whether this claim is proven, consider all the circumstances established by the evidence. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the following facts are true: [¶] 1. That Matthew Adams's improper conduct occurred after the conduct of Edward Holloway; [¶] 2. That a reasonable person would consider Matthew Adams's subsequent conduct as grossly improper, a highly unusual or an extraordinary response to Mr. Holloway's act; [¶] 3. That Edward Holloway did not know and had no reason to expect that Matthew Adams would subsequently act in the manner that he did; and [¶] 4. That Matthew Adams's death resulting from his acts were different from the kind of harm that could have been reasonably expected from Edward Holloway's conduct."

Parts of the proposed instruction repeat principles expressed in the standard instructions on causation or in other standard instructions, making it duplicative. Other parts of the proposed instruction are inaccurate, inflammatory and confusing. In evaluating whether Adams used drugs after he was injured by defendant, and if drug use was the cause of death, the jury needed to consider if drug use was an "unusual" act intervening between injury and death (as the standard instructions state) not whether drug use was "grossly improper" (as the proposed instruction states). In appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case" but "a trial court need not give a pinpoint instruction if it is argumentative" or duplicates other instructions. (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) The jury here received accurate and complete instructions on causation, including guidance on evaluating defendant's claim of a superseding intervening cause of death. No additional clarification was needed. The trial court did not err in refusing to give the requested instruction.

8

Moreover, any error in refusing the requested instruction was harmless. As just indicated, the standard instructions conveyed most of the principles stated in the requested instruction. To the extent the defense wanted to highlight its theory of death caused by unforeseeable drug use, this was done in defense counsel's closing argument to the jury. There was also overwhelming evidence that Adams died from head trauma, not a drug overdose. The autopsy showed a skull fracture with an underlying epidural hematoma and the pathologist testified, without contradiction, that Adams died "as a result of blunt force injuries to his head." The pathologist acknowledged the high level of methadone in Adams's blood at the time of his death but concluded that the drug was not the cause of death; a blow to the head was the "lethal mechanism." A forensic toxicologist expressed concerns about the large quantity of methadone Adams ingested but did not disagree with the pathologist's determination that a head injury, not a drug overdose, was the cause of death. The evidence also strongly supported the prosecution's theory that Adams took methadone before, not after, he was hit on the head. The police officer who interviewed Adams at the restaurant testified that Adams showed signs of opiate intoxication at that time. Degrio testified that Adams never answered the door bell or telephone after she left him and that he died in the same position she last saw him, suggesting that he died shortly after she left without rising to crush methadone pills. While she could not be certain, Degrio believed the crushed pills were "probably" on the table when she left. The evidence strongly supported the jury's finding that defendant caused Adams's death. The requested jury instruction, if administered, would not have led to a different finding.

2. *The trial court did not abuse its discretion in responding to jury questions during deliberations by referring the jury to the standard instructions on causation.*

The jury asked questions about causation during its deliberations and the court responded by directing the jury to the standard instructions. Defendant contends the court should have provided the jury with his proposed jury instruction on causation, discussed above, or some other clarification beyond the standard instructions.

9

The jury asked multiple questions during deliberations, including three questions on the issue of causation: "(1) Does a 'substantial factor' in a death need to be a 'but for' cause of death, meaning death would not have occurred without it? [¶] (2) If the defendant commits an act that would eventually have killed the victim, but before it does so, some other cause intervenes and kills the victim first, does that relieve the defendant of responsibility? [¶] (3) In this case, can the defendant's original act still be a substantial factor in causing the death?" The court concluded that the standard instruction it had given "is about as clear as we can make the causation issue." Defendant's proposed instruction, the court said, "was not completely balanced," "favored the defense," and would "mudd[y] the waters" were it administered.

The court did not abuse its discretion in referring the jury to the standard instructions on causation without further elaboration. "The court has a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) But "[t]his does not mean the court must always elaborate on the standard instructions." (*Ibid.*) Where, as here, "the original instructions are themselves full and complete," a trial court may "merely reiterate the instructions already given." (*Ibid.*) The court did not abuse its discretion in doing so here.

3. *The defense was not entitled to an adverse inference instruction*.

Defendant contends the prosecution failed to preserve evidence from the victim's apartment that was potentially useful to the defense. The victim's apartment had a nightstand with 13 loose pills, several of them cut and broken, next to a hand-held mirror with crushed powder on it. The police tested the pills and powder and found them to be methadone. All the powder was consumed during testing. In pretrial proceedings, the defense said "it would have liked to have tested the methadone for its purity to see how strong it was, possibly to see if it may have been a contributing factor as a cause of death" and asked the court to instruct the jury that the state's failure to preserve the methadone powder permitted the jury to infer that the powder contained a "[h]igh quality of methadone that was sufficient to cause [Adams] to reach toxic levels." The court denied the request.

10

A criminal defendant's right to due process imposes upon the prosecution a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 488-489.) But police "failure to preserve potentially useful evidence does not constitute a denial of due process" unless a defendant "can show bad faith on the part of the police." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.) "[A]n adverse [jury] instruction may be a proper response to a due process violation." (*People v. Cooper* (1991) 53 Cal.3d 771, 811.)

The trial court here concluded there was no due process violation and, thus, no basis for defendant's requested jury instruction adverse to the prosecution. The court noted that comparable evidence concerning the strength of the methadone powder was available to the defense by testing the remaining pills that had not been crushed into a powder and by autopsy findings that established the amount of methadone Adams ingested. The court also found the police did not act in bad faith in conducting a chemical test of the powder that consumed the small amount collected. Substantial evidence supports the court's findings.

## DISPOSITION

The judgment is affirmed.

_____
Pollak, Acting P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.