Filed 6/15/15  P. v. Silva CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068068 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FCH1200198) |
| JOSHUA SILVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Stanford E. Reichert, Judge.  Reversed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joshua Silva of second degree murder (Pen. Code,[1] § 187, subd. (a)). The jury also found true an allegation that Silva personally discharged a firearm causing death (§ 12022.53, subd. (d)). The court found true one serious felony prior conviction (§ 667, subd. (a)(1)) and one strike prior (§ 667, subds. (b)-(i)).

The trial court sentenced Silva to an indeterminate term of 60 years to life in prison.

Silva appeals contending the trial court prejudicially erred in admitting uncharged acts pursuant to Evidence Code section 1103, subdivision (b), and that the court failed to properly respond to the jury when it asked questions about the prior acts and Silva's criminal history (§ 1138).

In this case, the court admitted questions on cross-examination of Silva related to an alleged assault on his girlfriend several years prior to the events in this case, although the "crime" was never charged and no testimony was given regarding the alleged assault. The court also allowed questions regarding a previous case in which Silva was charged with attempted murder, where the case was tried twice resulting in hung juries and a judge ultimately dismissed the case. Again, there was no testimony regarding the facts of the alleged crime. In short, there was no showing of relevance of the "prior acts" except an argument that they were relevant to show Silva's character trait for violence.

When the jury, by its questions, demonstrated serious confusion about the import of the "acts" and a gross misunderstanding of the alleged acts and Silva's criminal history, the trial court declined to take any action to clarify the jury's patently prejudicial

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

confusion regarding such "evidence." Thus, we will conclude the trial court erred in allowing questions about the alleged acts and compounded the error when it failed to clarify the jury's misunderstanding. Accordingly, we will reverse the conviction.

STATEMENT OF FACTS

Silva does not challenge the sufficiency of the evidence to support his conviction. Nor does he challenge the admissibility of the evidence, with the exception of questions asked regarding the alleged prior acts. Therefore only a summary of the facts of the case is necessary to provide context for the discussion which follows. For the sake of convenience we will adopt the factual summary from the respondent's brief.

The Prosecution's Case-in-Chief

A. Joel Rendon's Murder

In the late evening of May 27, 2012, appellant walked into a 7-Eleven store in Chino. He was wearing a black Washington National's hat, a Dallas Cowboy's jersey, a pair of Dallas Cowboy gloves, and had a concealed handgun on his person. It was not cold that evening.

Appellant approached Jenaro Rodriguez, who was in the 7-Eleven to buy cigarettes, and said that he was not from the area and was looking for something to eat. Rodriguez told him there was a Jack in the Box about a quarter of a mile west of the 7-Eleven and a Del Taco close by, just east of the 7-Eleven. After appellant left the 7-Eleven, Rodriguez got into the car with his friend, Enrique Gomez. As Gomez drove away, he heard three gun shots and Rodriguez heard two. When Gomez turned to look, he saw appellant, who was holding a gun with his arm fully extended, and the victim,

3

Joel Rendon, who was falling to the ground. The two men appeared to be facing each other[2] and were standing about three to four feet apart. Gomez did not see anything in either of Rendon's hands. Both Rodriguez and Gomez saw appellant run immediately after the gun shots.

Around the time that appellant was at the 7-Eleven, Rendon and his friends and family, including Bryan Moe, Porfidia Cervantes, and Brandi Medieros,[3] were across the street at the Donut Avenue restaurant. On his way to Donut Avenue, and also while there, Rendon complained he had a stomachache. He was not otherwise upset, angry, or agitated that night, and he did not appear intoxicated. Rendon did not eat at the restaurant, but Moe bought a Gatorade drink for him.

Rendon walked out of the restaurant two or three times while his friends and family ordered food and ate. The apartment building where Rendon lived was across the street and just slightly to the east of the restaurant. There was also a liquor store across the street from Donut Avenue. Moe believed that Rendon left the restaurant at one point to go to the liquor store in order to purchase something for Wally. The dark tint on the restaurant windows and glare from car headlights prevented anyone from seeing the sidewalk or street outside through the restaurant windows.

Seconds after the final time Rendon walked outside of the restaurant, his friends and family heard gun shots. Several of them ran outside and saw Rendon on the ground,

_____

[2] Gomez had consumed approximately 12 beers throughout the day and evening.

[3] Mike Malagra and a man named Wally were also at the restaurant with Rendon.

4

lying face up.  They saw appellant, who was wearing a jersey, running away in a northwest direction.  Moe saw a gun in appellant's hand.  Neither Moe, Cervantes, nor Medeiros saw anything in Rendon's hands.  Their observations were confirmed by police.

## B.  Appellant Fled the Scene and Hid Under a Bush for Over Two Hours

Shari Nielson lived approximately one mile north of Donut Avenue.  A little after 11:00 p.m., she heard helicopters circling above her house.  She also heard her gate rattle.  Nielson called the police at 11:18 p.m.  She could see police cars throughout her neighborhood.  Approximately 10 to 15 minutes later, the helicopters flew closer to her house and shined a light into her neighbor's back patio.  As she was watching, she saw appellant run across her patio and head towards a big bush in her backyard.  She called the police again.  She could see appellant − who was wearing only a tank top and jeans − crouching down under the bush.

Before the police arrived at her house, the helicopters made announcements telling residents to stay indoors, that officers on the ground were using police dogs, and urging the suspect to come out of hiding and find the nearest officer.  Police arrived at Nielson's house at approximately 1:50 a.m. with a police dog.  As they searched her backyard, the dog located appellant under the bush and pulled him out.

## C.  The Murder Investigation

Officers located appellant's gloves in the driveway leading to the backyard of a house around the corner from where appellant was apprehended.  Officers also found appellant's jersey hidden between two receptacles next to the garage.  A couple of days

5

later officers located footprints that appeared to match the shoes appellant was wearing the night of the murder, and appellant's gun and magazine buried under the dirt in the backyard of the house. There was a round in the chamber of the gun, and 12 in the magazine. The magazine could hold 14 bullets, plus one in the chamber of the gun. Two expended cartridge cases which had been fired by that gun were found at the crime scene.

Officers found appellant's hat behind a locked gate at the house next door to the location where appellant's jersey, gloves, and gun were found.

A coroner's examination of Rendon's clothing revealed the presence of a four-inch folding knife in the closed position in his right front pocket. Another knife was found in the open position in his left front pocket. Neither knife was a switchblade. No blood was found on either knife.

Rendon suffered a total of six gunshot wounds, likely caused by two bullets. One bullet entered and exited through Rendon's abdomen. The bullet path went from left to the right, was short, and the bullet penetrated the skin and underlying tissue, but not the abdominal cavity. The shooter was to the left side of Rendon when he was shot in the abdomen. Rendon suffered another gunshot wound to the little finger on his left hand. A bullet entered through the top or back of the finger and exited through the bottom or palm side of the finger. It is possible that the wounds to the abdomen and finger were caused by the same bullet. The fatal gunshot entered through the left side of the back of his chest and exited the right side at the base of his neck. The trajectory of the bullet was left to right, upwards, and back to front.

6

Rendon could not have been facing the shooter when he suffered the fatal gunshot wound. The coroner testified that the entry and exit points and the trajectory of the fatal gunshot wound were consistent with Rendon, having already been shot in the abdomen and finger, turning to run. He opined that the most likely scenario to explain the upward and right trajectory of the fatal shot was that Rendon was bent over as he was running. He further opined it was possible for Rendon to end up lying on his back after being shot while facing away from the shooter. Rendon's blood level alcohol was .15 and chemical testing revealed the presence of methamphetamine.

The Defense Case

Appellant testified on his own behalf. He admitted that he was a member of the Whittier Varrio Locos gang at the time of the murder. Appellant claimed he knew of the gang Chino Sinners, but had never encountered any of its members.

Appellant testified that on the night of May 27, 2012, he was in Chino at a "gathering" at a friend's cousin's house. He smoked marijuana and took ecstasy. Appellant was hungry and went to the 7-Eleven. When he arrived, he asked someone whether there was a Jack in the Box nearby. He was given directions to Jack in the Box and Del Taco, and he decided to go to Del Taco because it was closer.

According to appellant, as he walked from the 7-Eleven to Del Taco, Rendon whistled at him, but he continued walking. Rendon then issued a gang challenge to him by asking where he was from. Appellant continued walking and said he was not from around there. He assumed he was in another gang's territory. Rendon then said, "don't be a little bitch. Where you from?" and appellant continued walking. Rendon then

7

allegedly punched appellant in the back of the head, causing him to stumble forward. Appellant saw a "shiny object" in Rendon's hand, so he shot him. Rendon fell to the ground and appellant took off running because he saw people come out of the restaurant who looked like gangsters. Appellant further claimed that while he ran, he encountered a truck with people riding inside who he thought were gang members hunting him. Appellant claimed that he hid in the bushes instead of finding a police officer because he is a gang member, and he did not think the police would help him after he had just shot someone.

On cross-examination, appellant testified that he took ecstasy on his way to the gathering and that he smoked marijuana while at the gathering just before he walked to the 7-Eleven. There was food at the gathering, but appellant wanted to eat at Jack in the Box. Instead of asking someone at the gathering for directions, he walked to the 7-Eleven to ask for directions.

Appellant wore his Washington National's hat because it had a "W," which symbolizes his gang. Appellant claimed he wore the gloves as a fashion accessory. He carried his gun in his pocket, which was fully loaded, and he was prepared to use it to kill someone if he had to. Appellant has "WVL" and "Black Angels" tattooed on his neck, which represent his gang and a click within his gang. Appellant denied that the Black Angels click was comprised of the more violent members of WVL.

While testifying appellant admitted he had been caught tagging "WVL" on trees in 2005, and that he ran from police and then lied when he was caught; had been served with a gang injunction in 2008, and had lied to police when he was caught engaging in

8

activities in violation of the injunction; had used drugs in the past, and was illegally in possession of the gun he was carrying when he encountered Rendon. Appellant also admitted that he was tried twice regarding the shooting of Raymond Carmona and that he was not acquitted of the charges.

Appellant admitted that while he was on the run, he heard the police helicopters circling overhead and that is when he took off his jersey, hat and gloves. He admitted that he hid his jersey between two trash cans, and that he disposed of all three items of clothing in order to avoid being caught by police. He also acknowledged burying his gun, and that his plan was to hide, avoid detection, and then escape. Appellant further testified that he did not come out from hiding and tell the police his account of the events because he doubted they would believe him. Nor did he tell police he acted in self-defense after he was arrested. Appellant admitted that gang members have a tendency to lie, and that if his fellow gang members knew he killed someone and got away with it, he would enjoy greater respect within the gang.

The parties stipulated that on November 26, 2007, Rendon was convicted of assault with a deadly weapon, to wit, a knife.

Appellant also presented evidence from Chino Police Officer Theodore Sutton, regarding his contacts with Rendon. Sutton told the jury that Rendon was a member of the Chino Sinners gang. He testified that Donut Avenue is within the Chino Sinners territory. He further testified that the circumstances of Rendon's 2007 conviction suggested it was gang related.

9

On cross-examination, Officer Sutton testified that when Rendon committed the 2007 assault, he was drunk. He further testified that the victim's wound was superficial and that the victim did not report the crime. Sutton testified that Rendon had not been convicted of committing any gang-related crimes since 2007.[4] Sutton had contacted Rendon on multiple occasions and Rendon appeared to have developmental issues. He was slow to comprehend and had difficulty communicating.

The Prosecution's Rebuttal Evidence

Officer Brian Corletto testified as the prosecution's gang expert. He testified that the Black Angels is a click within Whittier Varrio Locos and it is the most notorious click within that gang. It is considered to be the most violent, most feared, and most respected. Black Angels members can enhance their respect by shooting and killing a member of another gang even if that victim does not belong to a rival gang. Corletto knew appellant to be a member of the Black Angels.

Corletto testified that appellant has an extremely violent reputation. His opinion about appellant's reputation for violence was unchanged even though the officer testified that appellant had never been convicted of shooting anyone, stabbing anyone, or beating anyone up. Corletto noted that gang members can commit crimes and not get convicted.

As impeachment evidence, the prosecution presented a statement that appellant made during an interview after he was arrested. The day after the murder, appellant was interviewed at the police station. He told officers that he ran from 7-Eleven because

---

[4] The court admonished the jury that Rendon received a misdemeanor conviction for resisting arrest in 2009.

10

some "pisas" (Mexican nationals) were running towards him, saying the police were coming. He wanted nothing to do with the police, so he took off running as well.

## DISCUSSION

Silva raises two related contentions. First, he contends the trial court prejudicially erred in allowing questions about two different sets of uncharged acts. In the second, related contention Silva argues the trial court failed in its duty to answer the jury's questions regarding Silva's criminal history, leaving them with a misunderstanding of both his criminal history and the nature of the uncharged acts. We will deal with the two contentions together since the error in admitting evidence of uncharged acts was compounded by the court's failure to assist the jury.

### A. Background

When the prosecution became aware that Silva planned to testify at trial, it requested to be permitted to present information about two sets of prior acts. The first set involved an alleged 2009 assault and robbery of Silva's former girlfriend, Courtney Laica, which did not result in any criminal charges. The second set involved the criminal prosecution of Silva for attempted murder in the shooting of Raymond Carmona. The latter case resulted in two trials, each of which resulted in a hung jury. Ultimately the Carmona case was dismissed by the trial judge. In this case the prosecution contended the uncharged acts were admissible under Evidence Code section 1103, subdivision (b) to demonstrate Silva's character for violence. The trial court overruled the defense objections and ruled the evidence admissible.

The prosecution did not present any testimony regarding the facts of the alleged prior acts. No witnesses were called to describe the events. The only testimony was elicited from Silva on cross-examination. With regard to the Laica acts the prosecutor asked the following questions:

"Q: You have a former girlfriend named Courtney Laica, right?

"A: Yes.

"Q: And you're aware that she's told the police you're violent, correct?

"A: No.

"Q: You didn't know that?

"A: I didn't know that.

"Q: Would it surprise you to learn that Ms. Laica has told police she thinks you're violent?

"A: Say it again.

"Q: Would it surprise you to learn that Ms. Laica has told the police that she thinks you're violent?

"A: Yes, it would surprise me.

"Q: That would surprise you? Would it surprise you if you learned that Ms. Laica told police in 2009, that you always carry a gun? Would that surprise you?

"A: No, that wouldn't surprise me.

"Q: Would it surprise you to learn that your former girlfriend, Ms. Laica, told police in 2009 that she knew you were capable of killing someone?

"A: Yes, that would surprise me."

12

As the People have confirmed in their brief, the prosecutor offered no other evidence or argument regarding the Laica incident.

With regard to the alleged shooting of Carmona, the following questions and answers occurred:

"Q: That wasn't the first time you shot somebody, is it? 'That' referring to the shooting of the victim in this case.

"A: Yes, that was the first time I shot somebody.

"Q: You didn't shoot Raymond Carmona in Whittier?

"A: No.

"Q: In 2010?

"A. No.

"Q: Your counsel referred to you as being acquitted of that?

"A: Yes.

"Q: You actually went to trial twice and the jury couldn't reach a verdict, right?

"A: Yes.

"Q: You weren't acquitted, just couldn't reach a verdict, right?

"A: The judge said not acquitted.

"Q: You weren't acquitted by a jury were you?

"A: I guess. I don't know about that stuff.
"Q: Do you know what the word acquitted means?

"A: No, I don't.

"Q: Okay. If I told you acquitted means 12 people vote not guilty, is that what happened?

13

"A: No. That's not what happened."

Once again, the People concede the prosecution presented no further evidence or argument regarding the Carmona case.

During jury deliberations, the jury requested to hear Silva's "prior records regarding the armed robbery, assault and two murder trials." After discussions between the court and counsel the court informed the jury it could not give them any further information regarding Silva's prior record.

Following the court's response, the jury asked another question regarding Silva's record: "the judge stated to us after a side bar what we were to accept as fact regarding the prior convictions." After conferring with counsel the court responded to the jury that it "did not give the jury any facts the jury was to accept regarding Mr. Silva other than his height."

## B. Legal Principles

The court admitted three instances of wrongful conduct. Silva's 2004 conviction for attempted robbery, which is not contested here; an assault on Courtney Laica in 2009 and the shooting of Raymond Carmona in 2010. The attempted robbery was admissible as a prior felony conviction. The other two instances were admitted as relevant to the character trait of violence pursuant to Evidence Code section 1103, subdivision (b).[5]

---

5    Evidence Code section 1103, subdivisions (a) and (b) provide: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in

14

When we review a trial court's decision to admit or reject evidence of uncharged acts we apply the abuse of discretion standard of review. (*People v. Kipp* (1998) 18 Cal.4th 349, 369*; People v. Carter* (2005) 36 Cal.4th 1114, 1149.) We will only reverse the trial court's decision where there is a clear showing the trial court exceeded the bounds of reason and abused its broad discretionary authority. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

When a court rules on the admissibility of uncharged acts under Evidence Code section 1103, the court should consider the limitations on admissibility contained in Evidence Code section 352, in determining whether the probative value of such evidence is outweighed by its prejudicial effect. (*People v. Fuiava* (2012) 53 Cal.4th 622, 700; *People v. Riggs* (2008) 44 Cal.4th 248, 289-290.)

When a jury is deliberating and asks the court for assistance, the court must respond and provide such help as necessary to aid the jury. Section 1138 provides in part: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court." Thereafter, the court must take reasonable steps to assist the jury with their stated questions. It is not sufficient

conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1). [¶] (b) In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a). f which is subject to this subdivision."

15

for the court "figuratively throw up its hands and tell the jury it cannot help." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

## C. Analysis

If we analyze this case based only on the questions asked of Silva by the prosecution, we might lean toward the view that although inadmissible, they could be deemed harmless. The jury was aware of Silva's gang involvement, his prior conviction for attempted robbery and his own admission he always illegally carried a gun and was prepared to use it in his defense. Silva admitted the shooting, which he claimed was in self-defense. However, as we will discuss, the jury fixed its attention on the prior conviction and the alleged conduct involving Carmona and Laica. It demonstrated a profound misunderstanding of the record and the alleged acts, which misunderstanding was never clarified by the trial court. We cannot find the error here to be harmless.

## Admissibility

In order to be admissible, evidence of prior acts to prove character under Evidence Code section 1103, subdivision (b), must have a tendency in reason to prove the disputed character trait, in this case, violence. Once relevance is established, the court must apply Evidence Code section 352 to evaluate its probative value and its prejudicial effect. Here, we seriously doubt the material actually introduced was relevant or had any probative value.

Dealing first with the questions about Courtney Laica. There was no foundational evidence introduced to explain why the fact that Silva may or may not be surprised by Laica's comments about him was probative of his character for violence. Laica did not

16

testify and thus did not offer any opinions on Silva's character. On this record we have no idea what she may have said to police or what her actual opinion might have been. However, the nature of the questions assumes she did make reports and did offer an opinion about Silva's character for violence. The presence or absence of Silva's surprise proved nothing, but did imply something "might" have happened, without providing the jury with any idea of the context of any comments by Laica, and certainly did not provide the jury with any basis to intelligently evaluate this "evidence." When the prosecution made its in limine motion, it may have intended to present admissible evidence with some foundational basis. We do not know what happened between the pretrial stage and the defense case, but the material ultimately presented had virtually no probative value.

Turning next to the questions regarding the shooting of Carmona, again no foundational facts were presented to provide a basis for admissibility. Silva was apparently charged with the shooting, however, after two trials the prosecution could not obtain a conviction and a judge dismissed the case. However, nothing was presented to the jury in this case to show how the fact of charges, two trials and two hung juries proved anything regarding Silva's character for violence.

Aside from the lack of probative value, there was a more pernicious side to the presentation on this issue. The prosecutor was at pains to establish the Silva was not acquitted. Indeed the point was forcibly made that not all 12 people in either trial voted to acquit. The case was merely dismissed. The obvious inference the prosecution sought from such questions is that somebody believed he had committed the shooting. Of course we have not the slightest idea of who believed what or what the facts surrounding the

17

unsuccessful prosecution might have been. Thus the prosecution achieved an inference of factual guilt without any proof at all.

Again, the prosecution may have had other plans at the outset of the case, but the way the issue was presented to the jury provided no probative evidence, but did create the potential for prejudice.

Prejudice

As we have indicated, Silva argues the trial court breached its duty under section 1138 by failing to answer the jury's questions about Silva's prior record. While we agree the court had a duty to correct the jury's misperception, we discuss this point as an indicator of prejudice stemming from the improper admission of other act evidence. We agree the court here did literally throw up its hands and do nothing to aid the jury. (*People v. Beardslee, supra,* 53 Cal.3d at p. 97.)

The question presented by the jury included a reference to an armed robbery, and assault and two *murder* trials. Of course, there was no evidence of an armed robbery, although Silva admitted a conviction for attempted robbery. There was no "evidence" of an assault and certainly no evidence of two "murder" trials. Carmona was not killed, although the jury apparently got that impression.

While we appreciate that the attorneys could not agree on how to deal with the jury question, in the last analysis, it was the court's responsibility to respond. Clearly the jury could have at least been disabused of its erroneous assumptions. However, they were left with the court's response that there was nothing it could add. Logically, the jury would think their assumptions were correct.

18

All of this takes us back to our preliminary comments.  The questions standing alone had no probative value, and some clear potential for prejudice.  Given the vast prejudice of the gang evidence and Silva's admission that he killed the victim and that he illegally carried a firearm, there might have been a basis for a harmless error discussion.  However, this is one of the rare cases where we know the jury focused on the prior acts and record.  We know the jury seriously misunderstood the nature and import of the material and their misunderstanding was never corrected.  On this record we are satisfied the combined errors of admitting improper evidence and the court's failure to properly respond to the jury can only support a finding of prejudicial error.

## DISPOSITION

The judgment is reversed.


HUFFMAN, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

19